**Donald W. AYER, Jr., Plaintiff, Appellant,**

v.

**UNITED STATES of America, Defendant, Appellee.**

No. 89–2035.

United States Court of Appeals, First Circuit.

Heard March 6, 1990.

Decided May 14, 1990.

Barbara A. Cardone with whom Phillip D. Buckley and Rudman & Winchell, Bangor, Me., were on brief, for plaintiff-appellant.

Michael M. DuBose, Asst. U.S. Atty., with whom Richard S. Cohen, U.S. Atty., Augusta, Me., and Margaret D. McGaughey, Asst. U.S. Atty., Portland, Me., were on brief, for defendant-appellee.

Before CAMPBELL, Circuit Judge, and COFFIN and BOWNES, Senior Circuit Judges.

COFFIN, Senior Circuit Judge.

While participating in a visitor's tour of Vandenberg Air Force Base, Donald W. Ayer, Jr. fell and was injured. He brought suit for damages under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2674, on three counts. Count I alleged that the United States had failed to provide and maintain reasonably safe premises for civilian invitees. Count II claimed that the government had failed to warn tour members of the dangers presented by the facility design. Count III alleged negligent design of the site and failure to alter the design in a manner adequate to protect tour participants.

The District Court for the District of Maine dismissed Counts I and III, holding that the claimed negligence fell within the discretionary function exception to the FTCA. The court also granted summary judgment for the United States on Count II, ruling that Ayer had failed to bring forward any specific facts that rebutted the government's evidence that warnings were given. 721 F.Supp. 1395.

On appeal, Ayer contests both decisions. We affirm.

## I. FACTS

In November 1984, Ayer participated in a Distinguished Visitors Tour of Vandenberg Air Force Base, California, jointly sponsored by the Maine National Guard and the United States Air Force. Tour participants were shown facilities not ordinarily accessible to non-military personnel, including an underground missile launch site known as the Delta–Zero Launch Control Facility ("LCF"). The launch control chamber ("LCC") of the facility is a capsule-shaped underground room. The floor of the room is supported by shock absorbers and is not attached to the walls, leaving a two to three foot gap between the edge of the floor and the wall. At the time of the incident, there was no railing or other protective device around the circumference of the floor. The edge was marked, however, by a yellow line of paint or tape. The floor was painted a rust color, as were the walls, with the exception of the lower part of the

walls, which were painted a lighter brown color.

The control chamber was designed without an attached floor so that it would withstand reverberations from a near-miss nuclear detonation; the design allows the floor to move freely. The uncontroverted evidence also indicates that the chamber was designed without railings "to assure floor freedom of motion and to minimize shock and vibration transmission to sensitive electronic equipment or to personnel." Affidavit of M. Gordon Dittemore, Appendix at 109. Further, the lighting arrangements were established to be consistent with mission and operating needs.

The LCC at Vandenberg and six identical facilities nationwide constitute the national launch facilities for Minuteman missiles. Vandenberg Air Force Base is the only facility from which test launches are made and where personnel are trained in launch procedures. The LCCs were formally inspected to assure a standardized configuration.

The base commander at Vandenberg made an affirmative decision against structurally modifying the launch control facility to accommodate civilian visitors. This decision rested on a determination that any changes might jeopardize the launch site by confining the free motion of the floor and might impede training because Vandenberg's LCC would differ from other launch sites. Ayer does not dispute either the fact that this decision was made or the asserted reasons for the decision.

The government's evidence shows that the tour group in which Ayer participated received several warnings about the danger of falling presented by the LCC's design. First, on the bus carrying tour members to the facility, Air Force personnel informed the tourists that the floor was not attached and that they should therefore be careful to stay close to the middle of the room. Additional warnings were given immediately before the group descended in the elevator to the underground facility and again before they entered the chamber.

Donald Ayer was one of the last participants in his group to enter the control chamber. As he did so, his attention was focused on the tour leader, who had begun speaking. He moved to the left to make room for other participants still entering the chamber. In doing so, he stepped off the edge of the floor and fell through the gap between the wall and the floor to the platform located approximately six feet below. He sustained injuries to his knee, thigh and shoulder.

Ayer raises two issues to this court. First, he contends that Counts I and III were improperly dismissed because the discretionary function exception is inapplicable here. He gives two reasons for this conclusion. While admitting that the decision to invite tour members was protected by the discretionary function exception, he asserts that once civilian guests were invited, the government owed a duty of due care to those guests. He also argues that the judgment not to make safety changes does not involve the kind of policy considerations necessary to bring the decision within the discretionary function exception. He contends, therefore, that changes should have been made to protect visitors and that the government was negligent in failing to provide such measures, specifically including some sort of barrier, better lighting and adequate warnings of the danger.

Second, Ayer contests the grant of summary judgment on the claim of inadequate warnings. As evidence that warnings were given, the government presented affidavits from Air Force personnel and deposition evidence from another tour member. Ayer does not dispute this evidence. He claims, however, to have no recollection of warnings and asserts that his inability to remember raises a genuine issue of material fact about the adequacy of the warnings. We shall address each of these issues in turn.

## II. DISCRETIONARY FUNCTION EXCEPTION

In the Federal Tort Claims Act, the United States waived sovereign immunity from suit, declaring that:

The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances....

28 U.S.C. § 2674. The Act, however, contains a number of exceptions to liability. The exception relevant to this case provides that no liability shall lie for:

[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

As the Supreme Court has noted, this exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808, 104 S.Ct. 2755, 2761, 81 L.Ed.2d 660 (1984). If a discretionary function was involved, the fact that critical factors were not considered or that the decision was negligently made will not bring the challenged conduct outside of the exception. *Dube v. Pittsburgh Corning*, 870 F.2d 790, 797 (1st Cir.1989). *See also* 28 U.S.C. § 2680(a) (by its terms, the exception immunizes decisions "whether or not the discretion involved be abused").

■ The Supreme Court has addressed the scope of the discretionary function exception in three principal cases. *See Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988); *Varig Airlines*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984); *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). These cases establish that "[w]here there is room for policy judgment and decision, there is discretion." *Dalehite*, 346 U.S. at 35–36, 73 S.Ct. at 967–968. "[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function applies in a given case." *Varig Airlines*, 467 U.S. at 813, 104 S.Ct. at 2764. *Berkovitz* estab-

lished a two-part test for determining whether the exception applies. First, the action at issue must involve an element of choice. "[I]f the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect." *Berkovitz*, 486 U.S. at 536, 108 S.Ct. at 1958. Where there is room for judgment, the court then must determine whether the decision involved the *kind* of judgment Congress intended to protect:

The basis for the discretionary function exception was Congress' desire to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."

*Id.* at 536–537, 108 S.Ct. at 1958–1959 (quoting *Varig*, 467 U.S. at 814, 104 S.Ct. at 2764). In sum, the discretionary function exception "applies only to conduct that involves the *permissible* exercise of *policy* judgment." *Berkovitz*, 486 U.S. at 539, 108 S.Ct. at 1960 (emphasis added).

■ Ayer contends that the Air Force's decision against making safety modifications was an impermissible exercise of judgment because once the government opened its premises to guests, it automatically was subject to a duty of due care. He also argues that the reasons offered for the decision did not constitute the type of policy considerations that Congress intended to protect.

In making his first argument, Ayer relies heavily on the Supreme Court's decision in *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), where the Coast Guard's failure to maintain a lighthouse in good working order caused the loss of a ship. In *Indian Towing*, the Court rejected the government's claim of an implied exception to the FTCA for activities of a "uniquely governmental function." *Id.* 350 U.S. at 64–65, 76 S.Ct. at 124. The court held that once the Coast Guard "exercised its discretion to operate [the] light ... and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain

that the light was kept in good working order...." *Id.* at 69, 76 S.Ct. at 126.

In *Varig Airlines*, 467 U.S. at 812, 104 S.Ct. at 2763, however, the Supreme Court distinguished *Indian Towing*. The Court explicitly stated that the discretionary function exception was not at issue in *Indian Towing* because the government had conceded that the exception did not apply. The government, therefore, never claimed either that a permissible judgment had been made or that it was based on policy considerations. The *Varig Airlines* Court emphasized that the issue required inquiry into "whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability." 467 U.S. at 813, 104 S.Ct. at 2764. As we have noted, *Berkovitz* later clarified that this inquiry involves the application of a two-part test—whether a permissible judgment was involved and whether that judgment was based on policy considerations. 486 U.S. at 536–537, 108 S.Ct. at 1958–1959.

While clearly articulating this two-step standard, *Berkovitz* made what is, in our view, a confusing reference to *Indian Towing*.

> The decision in *Indian Towing Co. v. United States*, 350 U.S. 61 [76 S.Ct. 122, 100 L.Ed. 48] (1955), also illuminates the appropriate scope of the discretionary function exception. The plaintiff in that case sued the Government for failing to maintain a lighthouse in good working order. The Court stated that the initial decision to undertake and maintain lighthouse service was a discretionary judgment. See *id.*, at 69 [76 S.Ct. at 126]. The Court held, however, that the failure to maintain the lighthouse in good condition subjected the Government to suit under the FTCA. See *ibid.* The latter course of conduct did not involve any permissible exercise of policy judgment.

486 U.S. at 538 n. 3, 108 S.Ct. at 1959 n. 3. This reference fails even to mention that *Varig Airlines* had distinguished *Indian Towing* as not involving the discretionary

function exception. In the face of *Varig*'s plain language, it is unclear how much precedential value this footnote has. See *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1024 (9th Cir.1989).

In any event, as we understand the reference, the Court did not mean to say that once a decision was made to operate the lighthouse no *permissible* safety judgments could be made. Such a reading would fly in the face of *Dalehite*, 346 U.S. at 35–36, 73 S.Ct. at 967–968 ("[T]he 'discretionary function or duty' that cannot form a basis for suit under the [FTCA] includes more than the *initiation* of programs or activities. It also includes determinations made ... in establishing plans, specifications or schedules of operations.") (emphasis added). See also *Kennewick*, 880 F.2d at 1024–1025. Instead, the reference must mean that *Indian Towing* illustrated a situation where there was no exercise of *policy* judgment. See *Kennewick*, 880 F.2d at 1024 ("The more likely inference is that inspecting, repairing and maintaining the lighthouse involved decisions grounded not on political, economic or social, but rather on technological or scientific considerations."). Had a legitimate basis for failing to maintain the lighthouse been articulated, the result might have been different.

We therefore take the *Berkovitz* reference to *Indian Towing* to mean that, on the facts of that case, the failure to maintain the lighthouse did not rest on protected policy concerns. As a result, Ayer's claim that *Indian Towing* is analogous does not get us far. The mere fact that the Supreme Court held in *Indian Towing* that the government should be held to the standard of due care does not address whether the two-part test of *Berkovitz* was met in this case. We turn, therefore, to the *Berkovitz* test.

On the first prong, Ayer has produced no evidence showing that Vandenberg officials lacked the discretion to determine safety measures at their base. Unlike in *Berkovitz*,[1] there is no specific policy or regula-

---

**1.** *Berkovitz* held that a mandatory regulation or policy could remove discretion. 486 U.S. at 544,

tion mandating procedures to assure public safety. In fact, the affidavit of Major Ronald G. Maderas, Jr., Deputy Director of Safety at Vandenberg, states that safety measures were guided by Defense Military Standard 882A, which counsels that discretion be exercised "to achieve the optimum degree of safety within the constraints of operational effectiveness." Appendix at 149. Standard 882A "thus clearly directs the Air Force and other military departments to exercise discretion in adapting the standard to individual weapon system operations." *Totten v. United States,* 806 F.2d 698, 702 (6th Cir.1986). Appellant does not challenge either the applicability of the standard or its meaning. It is therefore beyond dispute that the exercise of judgment in this case was permissible.

The remaining issue is whether the Air Force's decision involved the kind of policy concerns protected by the discretionary function exception. The government presented affidavits articulating the bases for its decision. Major Maderas stated that the Air Force relied on the following considerations:

> First, the need to maintain operational realism in Vandenberg facilities whose primary purpose is to effect launch of ICBMs. Building on this point, it is necessary to preserve configurational features which ensure the reliable testing of ICBMs. Finally, it is necessary to preserve features of the original design whose purpose is to maintain the ability of the system to retain combat effectiveness, or, put another way, the ability of the system to withstand a near-miss nuclear attack.

Appendix at 149. Major General Jack Watkins, Commander of the First Strategic Aerospace Division at Vandenberg Air Force Base at the time of the incident, similarly stated:

> It was my policy and the ongoing policy of the base not to allow any changes in

the configuration of the equipment in Launch Facilities (LFs) or Launch Control Facilities (LCFs). Such changes would have included the placing of chains or safety railings in the Delta–0 Launch Control Capsule. This policy was the product of several considerations. First, the Vandenberg Launch and Control Facilities were used as actual launch facilities for other Minuteman Launch & Control Facilities across the nation. Vandenberg AFB was the only location where operational missiles were actually launched. At the six Minuteman bases where the approximately 1,000 missiles were physically located, the missiles were maintained on strategic alert. Logically, the Vandenberg AFB LFs and LCFs had to be identical to the LFs and LCFs located nationwide in order to insure the realism of the launch procedures. Were configurations changed in order to accommodate visitors, the military utility of the site would have been diminished. Second, changes in the configuration could have negatively affected the engineering requirements that were incorporated into the design of the Minuteman weapon system. For instance, configuration changes in the Delta–0 LCC might have impacted on the ability of the existing design structure to withstand as much ground-shock or vibration in the event of attack.

Appendix at 116.

Thus, the Air Force articulated two reasons for its decision not to include safety railings or to make other configurational changes in the LCC. First, it wanted Vandenberg to maintain the same configuration as other launch sites nationwide to assure realistic and transferrable training there. Second, the Air Force wanted to retain maximum floor mobility so as not to affect the survivability of the LCC in the

---

108 S.Ct. at 1963. In *Berkovitz,* agency regulations required that safety test data be received and that the agency determine that a product complied with all regulatory standards prior to the issuance of a drug license. The Court therefore found that claims that a vaccine license was issued prior to the receipt of safety data and before determining compliance were not barred by the discretionary function exception because there was no room under the regulations to exercise any judgment or choice.

event of an attack.[2]

We believe that both of these considerations involve the kinds of policy contemplated by Congress when creating the discretionary function exception. As the Supreme Court has noted, "the selection of the appropriate design for military equipment ... is assuredly a discretionary function.... It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness." *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 2517, 101 L.Ed.2d 442 (1988) (design of helicopter exits).[3] Unquestionably, maintaining the survivability of missile launch facilities and reliable training of personnel in the use of those facilities are military considerations that involve social and political policy. *Id.*[4] Those concerns underlay both the initial design of the LCC and the later maintenance of that design.

One may argue that the decision not to make any configurational changes, including the installation of a temporary barrier, was overly broad.[5] But as we have noted, the correctness of the decision is not at issue here and there is no contention that the stated policy concerns were pretextual. If the judgment represents the exercise of policy-based discretion, the court is precluded from second-guessing that judgment. *Varig*, 467 U.S. at 814, 104 S.Ct. at 2764. We hold that the district court properly dismissed Counts I and III of the complaint because the discretionary function excep-

tion immunizes the government from liability.

## III. ADEQUACY OF WARNINGS

■ In Count II, Ayer alleged that the Air Force had failed to warn tour participants of the danger presented by the design of the launch control chamber. The government presented uncontroverted evidence that warnings were given. While Ayer does not dispute this evidence, he contends that his alleged inability to recall the warnings creates a genuine issue of material fact as to their adequacy.

A court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2509–2510, 91 L.Ed.2d 202 (1986) (emphasis in original). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* 477 U.S. at 248, 106 S.Ct. at 2510. A party may not, however, "rest upon mere allegations; it must set forth specific facts demonstrating that there is a genuine issue for

---

**2.** The facility was designed without handrails to assure floor freedom of motion and to reduce shock transmission to equipment and personnel. *See* Affidavit of M. Gordon Dittemore, senior staff engineer on contract design, Appendix at 109, and Affidavit of Col. William D. Alexander, retired, Chief of Facilities Design of Air Force Ballistic Missile Division, Appendix at 112–113.

**3.** Ayer concedes in his brief that the original design of the LCC was within the discretionary function exception.

**4.** *Boyle* is consistent with other cases holding that the discretionary function exception pro-

tects policy judgments concerning safety precautions. *See, e.g., In re Consolidated U.S. Atmospheric Testing Litigation*, 820 F.2d 982, 995 n. 12 (9th Cir.1987) (in testing nuclear devices, government decision to balance safety considerations with the need to effect the tests was within the exception); *Bowman v. United States*, 820 F.2d 1393, 1395 (4th Cir.1987) (decision of park service not to use guardrails in Blue Ridge Parkway was discretionary function).

**5.** In fact, following Ayer's accident, the Air Force made an exception to the policy, allowing the erection of a temporary chain barrier.

trial." *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1985).

In this case, as we have noted, the government presented evidence that it gave warnings on more than one occasion and of the content of these warnings. Master Sergeant William B. Dalton's affidavit stated that Dalton personally had given tour members a safety briefing before the tour group was taken below ground. He "specifically warned them of the falling hazard in the below ground Launch Control Center (LCC) where the floor was not attached to the wall." Appendix at 110. He also explained the reason for the floor design and described its support on shock absorbers.

In addition, the government introduced the deposition of Peter Washburn, another tour participant. He indicated that tour members had been divided into three small groups for the tour of the Launch Control Facility. Washburn was a member of the same small group as Ayer. He stated that warnings had been given to them at three different times. While still on the bus, tour members were told that they had to be careful to stay near the middle of the platform because the floor was not attached to the sides of the chamber. Washburn specifically recalled that he was sitting toward the back of the bus and had no difficulty hearing the warning. He also stated that the other participants appeared to be listening. Washburn further recalled that tour members were divided into small groups specifically because of the small amount of space in the control chamber and the danger that was presented by the floor structure. Washburn also testified that additional warnings were given to the group immediately before they were taken below ground and again before they entered the chamber.

Ayer has provided no evidence concerning the adequacy or inadequacy of these warnings. He has not disputed the government's evidence regarding their content. He claims simply not to remember any warnings. This, he asserts, raises a dispute and should allow him to get to the jury on the issue of adequacy.

We cannot agree. Ayer's lack of memory does not create an inference that the warnings were inadequate. He must bring forward facts that tend to support in some way his charge that the warnings were inadequate—for example, that the warnings could not be heard, were given under confusing circumstances, were not specific, or the like. Ayer has not provided *any* description of the warnings that controverts the government's evidence. *Cf. Perez de la Cruz v. Crowley Towing & Transp. Co.*, 807 F.2d 1084, 1086–1087 (1st Cir.1986) (party's unsubstantiated claims to know the location of a ship could not create a genuine dispute about location where opposing party presented contrary evidence based on navigational charts and radar plottings).

We also reject Ayer's argument that his lack of memory creates a factual issue about adequacy because it must be considered in light of the particularly dangerous context: a dark room, a dangerous structure, and similarly colored walls and floor. These factors might indicate that warnings alone were not an adequate safeguard.[6] They do not, however, rebut government's evidence that specific, audible and repeated warnings were in fact given. Nor do they present a substantive challenge to the content of the warnings as given.

Ayer had three years in which to discover facts on this point and could present nothing more than his own lack of recall. Without some specific challenge to the adequacy of the warnings, we cannot say that Ayer has presented evidence creating a *"genuine* issue of *material* fact." We

---

**6.** As we have noted, however, the government's affirmative decision not to make structural safety changes was protected by the discretionary function exception. The fact that warnings, no matter how good, could not have been adequate is therefore not relevant to the discussion of this issue, but constitutes a separate claim of negligence from which we have held the government is immune.

therefore hold that Ayer has failed to show that there is a genuine dispute for trial on the issue of warnings.

*Affirmed.*