Elizabeth NOEL, Don Noel, Plaintiffs,

v.

**UNITED STATES of America, Department of the Navy, Defendants.**

No. C94–20240 EAI.

United States District Court, N.D. California.

July 19, 1995.

Jocelyn Burton, Asst. U.S. Atty., San Jose, CA, for U.S.

Richard Posilippo, Schneider, Luce, Quillinan & Morgan, Mountain View, CA, for plaintiffs.

## MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

INFANTE, United States Magistrate Judge.

### I. INTRODUCTION

This is an action under the Federal Tort Claims Act ("FTCA") against the United States and the Department of the Navy for negligence and emotional distress. Plaintiffs, husband and wife Don and Elizabeth Noel, allegedly sustained injuries while operating a concessionaire's ice cream cart during an air show at Moffett Field Naval Air Base when the wheel of the cart became lodged in a "pad-eye" on the aircraft tarmac, causing the cart to overturn.

Presently before the Court are the Government's motion to dismiss for lack of subject matter jurisdiction, or in the alternative for summary judgment. Having considered the motion papers, the comments of counsel, and good cause appearing: (1) the Government's motion to dismiss for lack of subject matter jurisdiction is GRANTED in part and DENIED in part; and (2) the Government's motion for summary judgment is DENIED.[1]

### II. BACKGROUND

On October 17, 1992, the Noels attended the Moffett Field Air Show as "civilian charity volunteers" to operate concessionaire's ice cream carts, with the invitation and authorization of the Navy. NAS Moffett Air Field ("Moffett Field"), located in Mountain View, California[2], was authorized to host open

---

1. The parties have consented that all proceedings in the above entitled case may be heard and finally adjudicated by the assigned magistrate judge pursuant to Rule 73, Fed.R.Civ.P. and 28 U.S.C. Section 636(c).

2. The Navy left Moffett Field in July 1994. The Field is now operated by the Naval Air reserve and NASA.

houses such as air shows for the general public pursuant to 32 C.F.R. § 705.34.[3] Lieutenant Commander William K. Quigley served as the Air Show Project Officer for the 1992 Air Show held on October 17–18, 1992.[4] As Air Show Project Officer, Quigley was responsible for planning and coordinating the air show.[5] There were no statutes, regulations or directives from either the Department of Defense or the Department of the Navy pertaining to crowd control or safety during an air show.[6]

### 1. The Crowd Control Plan

In preparation for the 1992 Air Show, Quigley formed an air show committee, and designated a crowd control officer, Commander Smith, with responsibility for developing a crowd control plan and setting up crowd control lines.[7] Whether Commander Smith developed a written crowd control plan is unknown.[8] Commander Smith also acted as the ramp security officer, and in that capacity was responsible for preparing a ramp security plan with safety officers.[9] Further, the ramp security officer and safety officers were responsible for (i) submitting fire/disaster and emergency plans, (ii) briefing all ramp security personnel, and (iii) posting security watches during the air show.[10]

The committee determined that it needed one hundred and forty (140) individuals to serve as a safety and security team at hangar one and the "ramp areas" where air show attendees and concessionaires would presumably be congregating.[11] The aircraft ramp area outside of Hanger One aircraft is a approximately 4000 feet long and 350–500 feet wide, containing thousands of uniformly spaced pad-eyes that are used to "tie-down" aircraft in high winds.[12] The pad-eyes are holes in the tarmac approximately three to six inches deep, five inches wide and eight inches long, and are spaced approximately twelve feet apart.[13]

The safety and security team was responsible for patrolling the aircraft parking ramp and hangar one exhibit area to give assistance to air show attendees, and also for providing special security for designated aircraft.[14] The committee further designated twenty safety observers to report any unsafe conditions.[15] Lastly, the air show committee developed an Air Show 92 Emergency Plan, which contained a list of additional safety precautions and emergency action plans.[16]

The Air Show 92 Emergency Plan does not specify any precautionary measures to be taken with regard to the pad-eyes. According to Quigley, the air show committee realized that hundreds of thousands of people would walk across the ramp areas containing the pad-eyes, but considered the risk of injury remote because the pad-eyes were clearly visible and avoidable.[17] Quigley also states in his declaration that the committee could not use pad-eye covers because they did not exist, and considered the use of barriers and warning cones impractical in light of the

---

3. Quigley testified during deposition, however, that every military installation is *required* by authority to host an annual open house event. Quigley Depo.Tr. at p. 102.

4. Quigley Decl., ¶ 8.

5. *Id.*

6. *Id.;* Ex. A to Burton Decl. at 26:9–15.

7. Quigley Decl.

8. Quigley Depo.Tr. at 20:13–16.

9. Quigley Decl., ¶ 3.

10. *Id.*

11. Quigley Decl., ¶ 4; *See also* aerial photographs attached as Exhibit E to Quigley Decl.

12. Quigley Decl.; *See also* copies of photographs of the flight ramp outside of Hanger One at Moffett Field attached as Exhibit A to Burton Decl., and copies of the relevant portions of NAVAIR 01–75GAA–2–1 pertaining to the parking of aircraft attached as Exhibit B to Burton Decl.

13. *Id.; See also* Don Noel Decl; Catherman Decl.

14. Quigley Decl.; Quigley Depo.Tr. at 37:11–26, 38:10–26, 39:1–7.

15. *Id.;* Quigley Depo.Tr. at 39:8–19.

16. Quigley Decl.

17. Quigley Decl.; Quigley Depo.Tr. at p. 42.

anticipated crowds of 300,000 each day.[18] Quigley explains that the committee felt that the barriers and cones would have been difficult to keep in place, and that it was more likely that a person would trip over a cone or a barrier than a pad-eye.[19] Neither Quigley nor anyone else involved in planning the air show considered implementing other types of warnings for the pad-eyes.[20]

Quigley testified that the primary purpose of the air show was to foster goodwill within the community. More specifically, Quigley testified that "[a]n open house is designed for public relations purposes, for the military within a local community to open up the gates and allow people to come in to see the base, to interact with the personnel on the base, and to see basically what their tax dollars are doing, so to speak, and how the military is providing for the defense of the nation."[21] However, Quigley testified that neither economics nor political considerations influenced decisions regarding crowd control or safety at the air show.[22]

### 2. The Concession Services Contract

The Moral, Welfare and Recreation Department of the Navy ("MWR") contracted with National Concession Company ("National Concession") to operate concession booths for food, ice cream, beverages and novelties at the 1992 Air Show.[23] The contract provided the following:

ARTICLE I

That the NAFI[24] shall:

1. Grant the CONTRACTOR concession rights for food, ice cream, beverage and novelties at the 1992 NAS Moffett Field Air Show, to be held 17 and 18 October 1992.

a. As the major air show concessionaire for food, ice cream, beverage and novelties, CONTRACTOR will be given primary control over all similar concessions operated at the event.

b. If it is mutually decided by the NAFI and the CONTRACTOR to include specialty food and novelty concessions, those concessionaires will contract through the CONTRACTOR for vending rights, with the entire booth fee (as determined by the NAFI) collected by the CONTRACTOR and turned over to the NAFI.

\* \* \* \* \* \*

5. Recruit and assign volunteer labor groups to man the concession groups throughout the entire event. The NAFI will pay ten (10) percent commission to volunteer organizations staffing the booths.

\* \* \* \* \* \*

ARTICLE II

That the CONTRACTOR shall:

1. Operate said concessions and provide service and products of a quality satisfactory to the Morale, Welfare and Recreation Department.

2. Keep the concessions open during the hours of 8:00 am to 5:00 pm on 17 and 18 October 1992.

\* \* \* \* \* \*

9. Responsible for erecting and tearing down booths. Booths will be removed at the end of the event on Sunday, 18 October 1992.

\* \* \* \* \* \*

14. Train all volunteer booth workers and provide procedural guides to all booth managers. Train all cash pick-up and counting staff in cash handling procedures, including forms.

\* \* \* \* \* \*

23. Provide NAFI with name[s] of all subcontractors.

That CONTRACTOR shall not:

---

18. *Id.*

19. *Id.; see also* Quigley Depo.Tr. at pp. 44–45.

20. Quigley Depo.Tr. at p. 45.

21. Quigley Depo.Tr. at pp. 102–103.

22. Quigley Depo.Tr. at pp. 56, 57.

23. Boyce Decl.

24. In the contract, MWR is referred to as NAFI, which means non-appropriated fund instrumentality of the Department of Navy, and National Concession is referred to as Contractor.

24. Represent or permit himself to be represented to the public as an agent or employee of the NAFI by the use of the name of the NAFI on letters, bills, signs, or by other means. CONTRACTOR, his servants agents, and employees are in no sense agents of the United States, the NAFI, Department of the Navy, Commanding Officer of NAS Moffett Field.

See Ex. A to Boyce Decl.

In accordance with the contract, Ms. Wendy Boyce, administrative assistant to the director of MWR, recruited volunteer labor groups to staff National Concession's food booths.[25] Boyce also received a request from one of National Concession's ice cream concession subcontractors, Faire Foods, Inc., to locate volunteer labor groups to staff its booths.[26] Although Faire Foods did not have a contract with MWR, Ms. Boyce (i) contacted various volunteer labor groups, (ii) explained that MWR did not have a contract with Faire Foods, (iii) asked whether the groups wanted their names forwarded to Faire Foods, and (iv) provided Faire Foods representative, Mr. Leonard Ivler, with the names of interested groups, including the Noels. Thereafter, MWR did not have any further contact with volunteer labor groups chosen to staff Faire Food's ice cream carts. The Noels volunteered to staff Faire Foods' ice cream carts.

### 3. The Accident

On or about October 17, 1992, the Noels attended the Moffett Field air show as volunteer workers, and were each provided a Faire Foods ice cream cart at the "staging area" in Hangar One.[27] Don Noel describes the ice cream carts as "rectangular boxes" with two large wheels and two smaller wheels approximately six inches in diameter.[28]

The parties provide different accounts of what occurred next. According to the Noels, the ice cream cart assigned to Elizabeth Noel did not have a handlebar, but had what appeared to be a leather or vinyl strip across the back of the cart for pushing, and an umbrella mounted on top of the cart.[29] The Noels were directed to push their ice cream carts out onto the tarmac and set up their carts approximately 130 yards from Hangar One.[30] As they pushed their carts from the Hangar out onto the tarmac, they were surrounded by "hundreds of thousands of people" who were attending the air show.[31] They assert that they were initially "completely unaware" of the existence of tie-down holes in the tarmac, and were unable to see them because of the "mobs of people."[32] Moreover, the Noels were not provided any assistance by the Navy in transporting their carts to their designated positions, nor were they warned by the Navy or anyone else of the existence of tie-down holes in the tarmac.[33] The Noels also did not notice any Navy or military personnel in the vicinity directing the crowds.[34]

Elizabeth maneuvered her cart without any guidance from her husband.[35] About halfway into her route, she noticed three or four tie down holes that seemed to appear "intermittently one at a time, in a sudden and random fashion without any discernable pattern due to the large crowds."[36] However, Don Noel did not see the tie-down holes at all until after the accident in question.[37]

As Elizabeth reached her destination, the wheel of her cart was caught in a tie-down hole, instantly causing the cart to overturn

25. Boyce Decl.

26. Boyce Decl.

27. Don Noel Decl.; Elizabeth Noel Decl.

28. Don Noel Decl.

29. *Id.*

30. *Id.*

31. Don Noel Decl.; Elizabeth Noel Decl.

32. Elizabeth Noel Decl.

33. Don Noel Decl.; Elizabeth Noel Decl.

34. *Id.*

35. Elizabeth Noel Decl.

36. Elizabeth Noel Decl.

37. Don Noel Decl.

and land on her leg.[38] According to Elizabeth, she did not see any tie-down holes in the vicinity of the accident because they were obscured by the crowds.[39] Mr. Noel was approximately five feet away from Elizabeth at the time of the accident, and did not witness the cart overturning.[40] Elizabeth was treated by Navy paramedics at a first aid station, and subsequently transported to El Camino Hospital by ambulance.[41]

The Government's version of the relevant events is set forth in a report dated December 18, 1992, prepared by investigating officer Lt. Commander Sue Catherman pursuant to Chapter II, Part B of the JAG manual.[42] The report is based almost entirely on Lt. Commander Sue Catherman's interviews with the Noels.[43] According to the report, an employee of Faire Foods by the name of Earl Hampton was responsible for supervising the volunteer workers.[44] The report states that Elizabeth Noel told Mr. Hampton that she would not be able to push the cart she was initially assigned because she suffered from a hernia, and that Mr. Hampton gave her another cart with bigger wheels for better maneuverability.[45] Although the second cart did not have a handle, Mr. Hampton stated that it would not present any problems.[46] The second cart also had a very large umbrella located in the center of the cart that obstructed her view completely.[47]

The Government's report further states that each of the five or six volunteers working for Faire Foods lined up, single file, with their respective carts and proceeded out of Hangar One with Mr. Hampton leading the way.[48] The report states that due to the "unevenness of the concrete" and the "holes" (pad-eyes), Don Noel was in front of Elizabeth guiding her to turn right, left, to go straight, etc.[49] According to Catherman's interviews with the Noels, the front left wheel of the cart dropped down into the pad-eye, and as Elizabeth pushed the cart forward in an attempt to dislodge the wheel, the cart rear-ended upwards and came down on Mrs. Noel's right shin.[50] Lastly, Catherman states in her report that the Noels attributed the cause of the accident to: (1) a defective ice cream cart without a handle, which could have created a "safety zone" between Elizabeth Noel's body and the cart; and (2) the uneven surface of the pavement and the pad-eyes.[51]

In their complaint, the Noels allege, *inter alia,* that defendants were negligent in (1) failing to employ sufficient means to control the crowds attending the air show, and the crowds obscured the "tie down" holes; (2) failing to employ warning signs, barriers, cones, or other safety devices; (3) failing to warn of unreasonable risk of injury posed by the aforesaid conditions; and (4) failing to divert or exclude the general public or the Noels from a hazardous condition.

### III. LEGAL STANDARDS

 The defense of lack of subject matter jurisdiction cannot be waived, and the court is under a continuing duty to dismiss an action whenever it appears that the court lacks jurisdiction. Fed.R.Civ.P. 12(h)(3). The standards that must be applied in ruling on a motion to dismiss vary according to the nature of the jurisdictional challenge. In general, a court is free to hear evidence regarding jurisdiction and to rule on that issue prior to trial. *Augustine v. United States,* 704 F.2d 1074 (9th Cir.1983). Howev-

---

38. Elizabeth Noel Decl.

39. *Id.*

40. Don Noel Decl.

41. Elizabeth Noel Decl.

42. Catherman Decl.; Defendant's Reply To Plaintiffs' Objections To Defendant's Evidence.

43. Catherman Decl.

44. Catherman Decl.

45. *Id.*

46. *Id.*

47. *Id.*

48. Catherman Decl.

49. *Id.*

50. *Id.*

51. *Id.*

er, a court may not resolve genuinely disputed facts where the "question of jurisdiction is dependent on the resolution of factual issues going to the merits." *Sun Valley Gas. v. Ernst Enterprises, Inc.*, 711 F.2d 138 (9th Cir.1983); *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir.1987), *citing, Augustine*, 704 F.2d at 1077.

■ In ruling on a jurisdictional motion involving factual issues which also go to the merits, the court should employ the standard applicable to a motion for summary judgment, as a resolution of the jurisdictional facts is akin to a decision on the merits. *Thornhill Publishing Co. v. General Telephone & Electronics Corp.*, 594 F.2d 730, 733–35 (9th Cir.1979); *Augustine, supra.* Summary judgment shall be entered against the non-moving party if:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). On a motion for summary judgment, the court must determine whether the evidence presented is such that a jury, applying the appropriate evidentiary standard, could reasonably find for either the plaintiff or defendant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). The test to determine whether a motion for summary judgment should be granted mirrors the standard for a directed verdict: "the trial judge must direct the verdict if, under governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250, 106 S.Ct. at 2511. Accordingly, in reversing a denial of summary judgment, the Supreme Court ruled:

> Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial" under Rule 56(c).

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

For purposes of summary judgment, the evidence is viewed in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in her favor. *Anderson, supra; Sischo–Nownejad v. Merced Community College Dist.*, 934 F.2d 1104 (9th Cir.1991). Furthermore, credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ruling on a motion for summary judgment. *Anderson, supra.*

## IV. DISCUSSION

The Government asserts that this Court lacks subject matter jurisdiction because: (1) the design and maintenance of the flight ramp was a discretionary function of the Navy and therefore, claims pertaining to the design and maintenance of the flight ramp are barred pursuant to the discretionary function exception of the FTCA; (2) the crowd control plan for the air show was a discretionary function, and therefore bars claims that the government allegedly failed to control the air show crowds; and (3) any alleged failure to warn resulted from the negligence of an employee of an independent contractor, not the Government.[52] In the alternative, the Government asserts that it is entitled to summary judgment on the grounds that it had no duty to warn the Noels of the existence of the pad-eyes because the pad-eyes were open and obvious.

### A. Discretionary Function Exception

The FTCA provides a limited waiver of the United States' sovereign immunity in lawsuits alleging negligent conduct of a United States employee. 28 U.S.C. § 1346(b). However, the FTCA contains a number of exceptions to liability, including the discretionary function exception, which provides in pertinent part:

> The provisions of this chapter and section 1346(b) of this title shall not apply to—

---

**52.** The Government does not assert that the Noels' failure to warn claims are barred by the discretionary function exception. *See* Defendant's Reply Brief In Support Of Motion To Dismiss For Lack Of Subject Matter Jurisdiction, Or In The Alternative, For Summary Judgment.

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). The basis for the exception was Congress' desire to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Berkovitz v. United States*, 486 U.S. 531, 536–37, 108 S.Ct. 1954, 1958–59, 100 L.Ed.2d 531 (1988). The Supreme Court has also explained that the exception is intended to "protect the Government from liability that would seriously handicap efficient government operations." *United States v. Muniz*, 374 U.S. 150, 163, 83 S.Ct. 1850, 1858, 10 L.Ed.2d 805 (1963).

■ Although plaintiffs bear the burden of establishing subject matter jurisdiction under the FTCA, the defendant bears the burden of proving the applicability of the discretionary function exception. *Prescott v. U.S.*, 973 F.2d 696, 702–704 (9th Cir.1992). Courts analyzing the discretionary function exception apply a two-step test. First, the challenged conduct must involve a matter of choice for the acting employee. *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because the 'employee has no rightful option but to adhere to the directive.'" *United States v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991), *citing Berkovitz*, 486 U.S. at 536, 108 S.Ct. at 1958. Second, the challenged conduct must be "of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536, 108 S.Ct. at 1959. The exception protects only governmental actions and decisions based on considerations of social, economic, or political policy. *Id.* at 537, 108 S.Ct. at 1959. It is insufficient for the government to show merely that some choice was involved in the decision-making process. *ARA Leisure Services v. United States*, 831 F.2d 193, 195 (9th Cir.1987); *Chotin Transportation, Inc. v. United States*, 819 F.2d 1342, 1347 (6th Cir.1987). Rather, the governmental decision must have been the result of a balancing of policy considerations. *ARA Leisure Services*, 831 F.2d at 195. If both tests are satisfied, the exception becomes applicable and the court is divested of jurisdiction to review claims based on the challenged conduct.

■ The Supreme Court has instructed that the applicability of the exception depends upon the "nature of the conduct rather than the status of the actor," and has rejected an analysis based exclusively on whether the challenged conduct was undertaken at the operational level or at the planning level of government activity. *United States v. Gaubert*, 499 U.S. at 325–326, 111 S.Ct. at 1275, *citing United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984). Accordingly, the discretionary function exception is not confined to the policy or planning level, but instead may reach decisions made at the operational or management level. *Id.*

### 1. The Design and Maintenance of the Flight Ramp

■ In the present case, the government contends that the design and maintenance of the flight ramp containing the pad-eyes fall within the discretionary function exception. The Supreme Court has stated:

We think that the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of [the discretionary function exception] provision. It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness.

*Boyle v. United Technologies Corp.,* 487 U.S. 500, 511, 108 S.Ct. 2510, 2518, 101 L.Ed.2d 442 (1988). The pad-eyes in the flight ramp were designed to enable the Navy to tie parked aircraft to the ramp to prevent the aircraft from tipping over in mild to high wind conditions.[53] Accordingly, the design of the flight ramp with exposed pad-eyes falls within the discretionary function exception.

### 2. The Use of Barriers Around the Pad–Eyes

The Government further contends that its decision not to use cones or other barriers around the pad-eyes is also protected by the discretionary function exception.[54] The evidence is undisputed that there were no statutes, regulations or directives from either the Department of Defense or the Department of Navy pertaining to crowd control or safety during an air show. Nor do the Noels contend that the Navy was without discretion to implement measures to safeguard the air show attendees. Thus, the first prong of the *Berkovitz* test is not at issue. The critical issue is whether the Navy's decision not to barricade the pad-eyes involved the kinds of policy concerns protected by the discretionary function exception.

The Government relies primarily on *Ayer v. United States,* 902 F.2d 1038 (1st Cir. 1990), in which the plaintiff, Ayer, was injured while participating in a tour of the underground missile launch site at Vandenberg Air Force Base. The floor of the room was supported by shock absorbers that were unattached to the walls, leaving a two to three foot gap between the edge of the floor and the wall. At the time of the accident, there was no railing or other protective device around the circumference of the floor. Ayer stepped off the edge of the floor, fell through the gap between the wall and the floor, and landed on the platform located approximately six feet below.

Ayer sued the United States under the FTCA, claiming, *inter alia,* that the United States had (1) failed to provide and maintain reasonably safe premises for civilian invitees, (2) negligently designed the site, and (3) failed to alter the design in a manner adequate to protect tour participants. The district court held, in relevant part, that the claims relating to the design and maintenance of the facility were barred by the discretionary function exception. The First Circuit affirmed. In analyzing the first prong of the *Berkovitz* test, the court found that there was no evidence showing that Vandenberg officials lacked the discretion to determine safety measures at their base, and that there was no specific policy or regulation mandating procedures to assure public safety. Indeed, the court noted that safety measures were guided by Defense Military Standard 882A, which instructed that discretion be exercised "to achieve the optimum degree of safety within the constraints of operational effectiveness." *Id.* at 1043.

In analyzing the second prong of the *Berkovitz* test, the First Circuit found that the base commander's decision not to make safety changes to the site involved social and political policy concerns protected by the discretionary function exception, that is, (i) maintaining the same configuration as other launch sites nationwide to assure realistic and transferrable training there, and (ii) retaining the maximum floor mobility so as not to affect the survivability of the launch control chamber in the event of an attack. *Ayer,* 902 F.2d at 1042–1044. In effect, the base commander decided to sacrifice civilian safety in favor of preserving military function.

The government also relies on *Valdez v. United States,* 56 F.3d 1177 (9th Cir.1995), in which the Ninth Circuit held that the Government's failure to warn of certain dangers in the Kings Canyon National Park "clearly implicate[d] a choice between the competing policy considerations of maximizing access to and preservation of natural resources versus the need to minimize potential safety hazards." The court's decision was based in large part on the fact that the United States

---

**53.** *See* NAVAIR 01–75GAA–2–1 Technical Manual attached as Exhibit B to Burton Decl.

**54.** The Government does not contend that plaintiffs' failure to warn claim is barred by the discretionary function exception. *See* Reply brief, p. 2. However, barricades are a type of warning.

National Park Service ("NPS") is required by statute to balance preservation and public access, and must decide, with limited resources and unlimited natural hazards, what types of warnings it will provide. *Valdez, supra, citing Childers v. United States,* 40 F.3d 973, 975 (9th Cir.1994) ("For example, 16 U.S.C. ¶ 1 requires the NPS to balance preservation and public access, forcing it to 'exercise judgment and choice about what sorts of facilities and safety features, if any, to provide.'").

However, unlike *Ayer* and *Valdez,* the Government in this case has failed to point to a Naval regulation expressly or impliedly imposing an affirmative duty to balance access to a navy base and safety, and the evidence before the Court is to the contrary. In *Ayer,* the Government presented evidence that Defense Military Standard 882A required a balancing to achieve optimum safety and operational effectiveness. In *Valdez,* the Government presented evidence that the National Park Service was similarly required by statute to balance preservation and public access. In contrast, the evidence in the present case indicates that the Government's decision not to use barriers was motivated solely by safety considerations, not a balancing of social, economic, or political considerations.

■ In general, safety related government decisions that are not motivated by policy considerations do not fall within the discretionary function. *See Summers v. U.S.,* 905 F.2d 1212 (9th Cir.1990); *ARA Leisure Services v. U.S.,* 831 F.2d 193 (9th Cir.1987) (decision to design and construct a road was a policy decision protected by the discretionary function exception, but failure to adequately maintain roads was not); *Seyler v. United States,* 832 F.2d 120 (9th Cir. 1987) (failure to erect speed limit signs not protected by the discretionary function exception); *Sutton v. Earles,* 26 F.3d 903 (9th Cir.1994). Furthermore, the Ninth Circuit has recently instructed that in safety related cases where the government allegedly failed to warn, the use of the discretionary function is limited to "those unusual situations where the government was required to engage in

broad policy-making judgments related to safety." *Faber v. United States,* 56 F.3d 1122 (9th Cir.1995), *citing Lesoeur v. United States,* 21 F.3d 965, 970 (9th Cir.1994). In *Lesoeur,* the Ninth Circuit held that the Government's decision not to warn about the lack of regulations of rafting tours in a national park was protected by the discretionary function. That case involved unique circumstances, however, that are not present in the case presently before the Court. The *Lesoeur* court's holding was based on the fact that the tours were operated by the Hualapai Indian Tribe, and that the decision not to regulate the tours involved a broad policy-based consideration not to regulate Indian tribal activities.

■ In this case, the Government's initial decision to allow the general public onto the tarmac to view the air show was probably rooted in broad public policy considerations. However, this does not mean that all subsequent Government decisions that are related to the opening of the base are automatically also rooted in public policy considerations. Allowing such a broad application of the discretionary function exception would, in effect, immunize almost all governmental activity from suit under the FTCA. Once the Government decided to open the air base, it essentially acted no differently than a private individual deciding what measures to take to ensure the safety of visitors and to warn against potential dangers. Unlike *Ayer,* there is no evidence in this case that the decision not to use barriers was motivated by the need to provide a uniform training centers or to maintain military readiness. Also unlike *Valdez,* there is no evidence in this case that the challenged conduct implicated a choice between the competing interest of maximizing access to and preservation of natural resources versus the need to minimize an unlimited number of potential natural hazards on a limited budget. In short, there is no evidence that the Government's decision regarding barriers involved the balancing of competing public policy considerations that Congress intended to protect.[55] Because the

---

**55.** The Ninth Circuit has indicated that it is not essential for the Government to show that a

conscious decision weighing competing policy concerns in fact was made. *Sutton v. Earles,* 26

Government has failed to establish the applicability of the discretionary function exception, the Government's motion to dismiss plaintiffs' claim regarding failure to barricade the pad-eyes is DENIED.

### 3. The Crowd Control Plan

■ The Government similarly contends that the crowd control plan was a permissible exercise of the Navy's discretion that was rooted in policy considerations. The Noels do not expressly dispute this premise. Instead, they essentially contend that (1) the Navy's *execution* of its crowd control plan— as compared to the plan itself—was purely operational, and did not involve discretionary governmental or legislative actions based on high level economic, social or political policies; and (2) the Navy's negligent execution of its own crowd control plan creates a basis for liability. More specifically, the Noels contend that the Navy failed to meet and comply with its crowd control plan by failing to (a) provide patrols in the tarmac area, (b) warn of the tie-down holes, (c) control the crowds, and (d) cordon off a safe corridor for the transportation of the concession carts out to the designated areas of the tarmac.

In support of their position, the Noels cite to three cases for the proposition that the discretionary function exception is inapplicable to any safety decisions at governmental facilities because such decisions are made at the "operational" stage rather than the "planning" stage. *See Henderson v. United States*, 784 F.2d 942 (9th Cir.1986); *McGarry v. United States*, 549 F.2d 587 (9th Cir.1976); *Driscoll v. United States*, 525 F.2d 136, 138 (9th Cir.1975). However, these cases conflict with the Supreme Court's decision in *Gaubert*, in which the Court instructed that the discretionary function exception is not confined to the planning level. Accordingly, the cases cited by the Noels are not dispositive.

However, more recent caselaw does support the Noels' position. In *Summers v. U.S.*, 905 F.2d 1212 (9th Cir.1990), the plain-

tiff's injury was allegedly caused by the Park Service's failure to warn of the dangers of hot coals in man-made fire pits at a recreation area. The Ninth Circuit found that the Park Service's safety program, including its policy regarding the placement of warning signs, was a discretionary function, but ultimately held that the Park Service's decision not to post warning signs was not rooted in public policy, stating "where the challenged governmental activity involves safety considerations under an established policy rather than the balancing of competing policy considerations, the rationale for the [discretionary function] exception falls away and the U.S. will be responsible for the negligence of its employees." *Summers*, 905 F.2d at 1215.

In *Aslakson v. United States*, 790 F.2d 688 (8th Cir.1986), the court held that the discretionary function exception did not shield the Government from liability for failure to comply with its own stated safety policy in the maintenance of electrical transmission wires. The Eighth Circuit reasoned that once the government had exercised its discretion to adopt safety regulations and to conduct safety inspections of its power lines, it was obligated to take reasonable steps to enforce compliance with the applicable safety regulations. *Aslakson*, 790 F.2d at 693–694. *See also Chotin Transportation, Inc. v. United States*, *supra* (government's negligent performance of its self-imposed safety regulations is not protected by the discretionary function exception).

Like *Summers* and *Aslakson*, the Government's initial decision to establish a crowd control plan, including its decision to assign a safety and security team at the ramp and Hangar One area to assist air show attendees, arguably falls within the discretionary function exception. However, there is nothing in the record to indicate that the Government's allegedly negligent *execution* of its self-imposed crowd control plan involved a balancing of social, economic, or political poli-

F.3d 903, 910, n. 6 (9th Cir.1994). "The essential point is that the decision ... is not the kind of policy decision protected by the discretionary function exception." *Id.; see also Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1028 (9th Cir.1989) ("the relevant question is not

whether an explicit balancing is proved, but whether the decision is susceptible to policy analysis"). However, in the present case, the Government has failed to present any evidence suggesting that the decision not to use barricades was even "susceptible to policy analysis."

cy considerations. Nor does the Government contend otherwise. The discretionary function exception is inapplicable to the Noels' claim that the Navy negligently executed its crowd control plan. Accordingly, the Government's motion to dismiss the Noels' claim regarding the negligent execution of the crowd control plan is DENIED.

### B. Whether the Pad–Eyes Were Open And Obvious

The Government further contends that it had no duty to warn the Noels of the existence of the pad-eyes because the pad-eyes were open and obvious. Under California Law, it is well established that there is no duty to warn where the dangerous condition is open and obvious. *See e.g. Beauchamp v. Los Gatos Golf Course,* 273 Cal.App.2d 20, 27, 77 Cal.Rptr. 914 (1969). However, the Noels have satisfactorily established that there is a genuine issue of material fact as to whether the existence of the pad-eyes, as well as the systematic manner in which they were laid out on the tarmac, were obscured by the crowds attending the air show.[56] Indeed the aerial photographs of the air show submitted by the Government depict a countless number of people congregating on the tarmac.[57] Furthermore, Quigley states in his declaration that the public affairs office estimated that approximately 400,000 to 425,000 people attended the air show on October 17, 1992.[58] Accordingly, the Government's motion for summary judgment as to the Noels' failure to warn claim is denied.

### C. Government Liability for Acts of Independent Contractors

Lastly, the Government contends that the Noels' claims are barred because their alleged injuries were caused by an employee of an independent contractor, and not by an employee of the United States. Specifically, the Government contends that Faire Foods is an independent contractor over whom the Government did not exercise any control, and that Faire Foods (1) failed to train the Noels by warning them of the existence of the pad-eyes, (2) failed to pre-position the ice cream carts prior to the air show, (3) supplied Mrs. Noel an ice cream cart with a defective handle, and (4) directed the Noels across the ramp to the area where Mrs. Noel was injured.

Pursuant to 28 U.S.C. §§ 1346(b), 2679, the United States is liable only for injuries caused by the wrongful act or omission of an "employee" of the Government while acting within the scope of his or her office or employment. In support of their position, the Government has presented evidence suggesting that Faire Foods is an independent contractor and may have been negligent. However, the Noels have presented evidence supporting their claims that the Navy failed to adequately control the crowds at the air show, that the government failed to warn the Noels of the exposed pad-eyes, and that the government's failure to act caused their injuries. Thus, there are genuine issues of material fact as to whether, and to what extent, the Government or Faire Foods is responsible for the Noels' injuries. It is conceivable that the trier of fact may find that the Government, Faire Foods, and the Noels are all negligent, resulting in a comparative fault analysis. *See Li v. Yellow Cab,* 13 Cal.3d 804, 119 Cal.Rptr. 858, 532 P.2d 1226 (1975) (California recognizes comparative fault.) Accordingly, the Government's motion for summary judgment is DENIED.

### V. CONCLUSION

For the reasons stated above, the Government's motion to dismiss is GRANTED in part as to the Noels' claim for negligent design and maintenance, and DENIED in all other respects. The Government's motion for summary judgment is DENIED.

**IT IS SO ORDERED.**

---

**56.** *See* Elizabeth Noel Decl.; Don Noel Decl.

**57.** *See* Quigley Decl., Ex. E.

**58.** *See* Quigley Decl., ¶ 8.