James V. LEWIS and Frances Lewis, Plaintiffs,

v.

The UNITED STATES NAVY and the United States of America, Defendants.

Civ. A. No. 8:93–979–3.

United States District Court, D. South Carolina, Greenwood Division.

July 14, 1994.

John R. McCravy, III, Callison, Dorn, Thomason, Garrett & McCravy, Greenwood, SC, for plaintiffs.

Bridget A. Gauntlett, Rupert Mitsch, U.S. Dept. of Justice, Torts Branch, Civ. Div., Washington, DC, for defendants.

## ORDER

GEORGE ROSS ANDERSON, Jr., District Judge.

This matter is before the Court for final determination following a bench trial conducted on May 23–24 and 31, 1994. The Court finds for the Defendants, the United States Navy and the United States of America, for the following reasons.

This case was brought by the Plaintiffs alleging that the United States Navy and the United States of America negligently failed to warn the Plaintiff, James Lewis, of the long term health effects of his exposure to mustard gas. Mr. Lewis was exposed to mustard gas by the United States Navy during secret chemical warfare experiments during the Second World War.

█ Mr. Lewis has alleged that, although the Defendants' intentional exposure of Mr. Lewis to mustard gas in 1943 is barred by the doctrine of sovereign immunity,[1] the Defendants committed a second, negligent, tort in 1964 when they failed to warn him of the long-term health effects of his previous exposure. This second tort is alleged to have occurred after Mr. Lewis' discharge from the Navy and is alleged to have breached an independent duty of care that arose when the

Navy and the Government allegedly became aware of these so called long-term health effects, some time in the early to mid 1960's.

The United States Navy and the United States of America defend this claim on two grounds. First, the Government claims that the doctrine of *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), bars recovery for this tort as it was incident to Mr. Lewis' active service and did not occur entirely post-discharge. Second, the Defendants claim that their failure to warn Mr. Lewis was an exercise of discretion, and thus any claim arising from this decision is barred by the Discretionary Function exception to the Federal Tort Claims Act.

## Findings of Fact

1. Plaintiffs, James Lewis and his wife, Frances, filed administrative claims with the Navy on September 15, 1992, seeking $11.2 million in damages.

2. Plaintiffs' administrative claims were subsequently denied by the Navy on January 5, 1993, and Plaintiffs filed suit against the United States Navy and the United States of America.

3. Plaintiffs' claims arise out of plaintiff James Lewis' participation in military tests conducted during World War Two.

4. Plaintiff James Lewis enlisted in the Navy on September 2, 1943, in South Carolina.

5. Plaintiff was then sent to Bainbridge, Maryland, for training.

6. While at Bainbridge, Plaintiff volunteered to participate in tests of protective clothing and was sent to the Naval Research Laboratory (NRL) in Washington, D.C., in return for an additional week's leave and $100.00 dollars.

7. Dr. Homer Cathcart, Head of the Combustion and Fuels Branch, Chemistry Division at NRL, testified that the purpose of the NRL tests was to attempt to develop

---

1. The Federal Tort Claims Act, in which the Congress of the United States created a limited waiver of sovereign immunity for certain torts committed by the United States, was not passed until 1946 and expressly excludes torts committed before January 1, 1945. Because the initial exposure of Mr. Lewis to mustard gas occurred in 1943, that potential tort is barred by the doctrine of sovereign immunity.

effective clothing and devices to protect American servicemen from the ill effects of mustard gas seen during and after World War I. Dr. Cathcart was a scientist at NRL in November, 1943, who served as the liaison between the scientists in the Chemistry Division of NRL who designed the chamber tests and the medical officers who supervised and ran the tests.

8. Dr. Cathcart also testified that the scientists and medical supervisors at NRL who designed and conducted the mustard gas tests were knowledgeable about the World War I experience with mustard gas as a result of studies done after World War I about the health effects of the chemical weapons used during the war.

9. In 1928, Colonel Harry L. Gilchrest, United States Army, Chief, Medical Division, Chemical Warfare Service, conducted a comparative study of the servicemen injured during World War I by gas and other weapons, which included a preliminary report on the residual effects of warfare gasses. *See* Gilchrest, Harry L., M.D., *A Comparative Study of World War Casualties From Gas and Other Weapons* (1928).

10. In 1933, Harry L. Gilchrest, M.D., Major General, United States Army, Chief, Chemical Warfare Service, published another study in the open, unclassified literature, co-authored by Philip B. Matz, M.D., Chief, Medical Research Subdivision, Veterans' Administration, entitled "The Residual Effects of Warfare Gasses." *See* Gilchrest, Harry L., M.D., and Matz, Philip B., M.D., *Residual Effects of Warfare Gasses* (1933).

11. The "Residual Effects of Warfare Gasses" documents the long-term health effects of exposure to mustard gas seen in World War I servicemen who had been gassed with mustard and chlorine during the war.

12. By 1933, the United States Government was aware that the long-term health effects of mustard gas were to the eyes, skin, and respiratory system. Some of the specific conditions they determined could be mustard gas related were bronchitis, emphysema, bronchial asthma, corneal opacities, and various skin affections.

13. Dr. Cathcart testified that it was believed at the time of World War II that chemical agents would be used in combat. It was known that the Germans were heavily armed with advanced chemical munitions. It was also believed that chemical agents would be used in the Pacific where there were reports that the Japanese had used sulfur mustard against the Chinese.

14. Therefore, war-related research programs were established under President Roosevelt's White House Office of Scientific Research and Development, and secret testing of protective clothing, ointments, and gas masks were undertaken.

15. Between 1943 and 1946, the Military Departments of the United States carried out hundreds of mustard gas and Lewisite tests at various sites, including the NRL in Washington, D.C., Edgewood Arsenal in Maryland, Camp LeJune North Carolina, and the Great Lakes Naval Training Center in Illinois.

16. In "Veterans At Risk," a 1993 review of the literature regarding the health effects of mustard gas and Lewisite, the National Academy of Sciences estimated that over 60,000 U.S. servicemen participated in World War II tests, ranging from patch tests to arm chamber and full-body chamber tests.

17. Plaintiff was one of the servicemen who participated in the full-body chamber tests conducted at NRL, which were designed to test the effectiveness of protective clothing and masks against sulfur mustard gas.

18. Plaintiff was assigned Suit No. 8, a water suit, during the experiments in which he participated.

19. Plaintiff was exposed to sulfur mustard gas while in a chamber for a one-hour period on three consecutive days beginning November 8, 1943, wearing protective gear, including clothing and a gas mask.

20. The protective clothing worn by plaintiff in the chamber consisted of a gas mask, a complete Navy Arnzen suit over GI underwear and impregnated winter underwear pants, impregnated elbow-length gloves, two pairs of impregnated socks, and overshoes.

21. Plaintiff was examined four hours after he participated in the first chamber test on November 8, 1943, and no remarks were noted.

22. Plaintiff was examined again twenty-four hours after he participated in the first test and erythema was noted to be present on his arms and shoulders.

23. On November 9, 1943, plaintiff again participated in a chamber test of one-hour duration.

24. Plaintiff was examined four hours after the second chamber test, and was noted as having erythema on the dorsal thorax, shoulders and arms.

25. On November 10, twenty-four hours after the second test, plaintiff was again examined and was found to have erythema on the dorsal thorax, shoulders and arms.

26. On November 10, 1943, after the second twenty-four hour examination, the plaintiff participated in his third one-hour chamber test.

27. Plaintiff was examined four hours after the third chamber test and was found to have erythema on the ventral thorax, dorsal thorax, shoulders and legs.

28. Plaintiff did not participate in any more chamber tests after November 10, 1943.

29. On November 11, 1943, twenty-four hours after the third chamber test, the plaintiff was examined and erythema was noted on the dorsal thorax, shoulders, arms and legs.

30. On November 12, 1943, the plaintiff was again examined and was noted to have erythema of the dorsal thorax, arms, shoulders, legs and right cubital fossa.

31. Plaintiff did not have any blisters at any time during his participation in the tests at NRL.

32. On November 12, 1943, the plaintiff left NRL to go home on leave.

33. On November 20, 1943, the plaintiff returned to NRL from leave.

34. Plaintiff was given an examination on November 20, 1943, at which no remarks were noted.

35. Plaintiff was then sent back to Bainbridge, Maryland.

36. Plaintiff was not exposed to Lewisite during the tests in which he participated in November, 1943.

37. Plaintiffs alleged injuries were incurred while he participated in military testing of protective clothing at NRL, as an active duty member of the Navy.

38. Plaintiff continuously served in the Navy from September 2, 1943, re-enlisting at the end of each period of enlistment, until January 22, 1963, when he retired from active duty.

39. Plaintiff's risk factors, such as a long history of smoking and substantial sunlight exposure, are more probable causes of the respiratory and skin conditions that plaintiff has developed over the past fifteen years.

40. For more than forty years after participating in mustard gas tests, plaintiff had none of the health problems that can be caused by exposure to mustard gas.

41. Dr. Kenneth Smith, a dermatologist who treated plaintiff for alleged skin cancers, testified that he removed a number of lesions from the plaintiff's skin in 1987 and 1988.

42. Dr. Smith, who is also a dermapathologist, testified that he reviewed the lesions under a microscope after surgically removing them and determined that many of them were squamous cell carcinomas in situ and that he found solar elastosis present in the dermis.

43. There is no credible evidence that plaintiff's health problems were caused by his exposure to mustard gas. The testimony of the plaintiff's experts is speculative.

44. Dr. Steven Lamm, the defendant's epidemiology expert, testified that there is no medical or scientific evidence of a synergy between mustard gas and either smoking or sun exposure.

45. Dr. Lamm further testified that the medical community has known of the long-term health effects of exposure to mustard gas since "Residual Effects of Warfare Gasses" was published in 1933.

46. Dr. Charles Gary Hurst, Commander of the U.S. Army Medical Research Institute of Chemical Defense, defendants' dermatology expert, testified that historically, actinic keratoses have been recognized as a consequence of chronic sun exposure in seamen or farmers.

47. Dr. Hurst opined that plaintiff's actinic keratoses were to a reasonable degree of medical probability caused by sunlight damage to his skin and a result of his fair complexion, poor ability to tan, and exposure to substantial amounts of sunlight throughout his life.

48. Plaintiff's medical records contain no evidence of respiratory ailments before the 1980's.

49. Plaintiff started smoking at the age of 12, and smoked at least 1 pack per day regularly from the age of 17 until the age of 50.

50. At that time, plaintiff stopped smoking cigarettes and switched to smoking an average of four filtered cigars per day. He continues to smoke an average of four filtered cigars per day.

51. Dr. Harold Jackson, a pulmonologist who evaluated plaintiff in 1992, testified that the results of the pulmonary function test plaintiff took in May, 1982 indicated a mild obstructive ventilatory defect which he determined was caused by smoking in combination with non-conditioning secondary obesity.

52. Dr. William Johnson, a pulmonologist who treated plaintiff in 1991 and 1992, also testified that plaintiff's respiratory problems were caused by smoking and obesity.

53. Dr. Johnson further testified that he advised the plaintiff to stop smoking and loose weight, but the plaintiff failed to make these lifestyle changes.

54. Dr. John Urbanetti, the defendants' expert pulmonologist, testified that plaintiff has sensitive airways, a condition which predisposes him to having asthma. He further testified that plaintiff has chronic bronchitis which was to a reasonable degree of medical probability caused by his long history of smoking, rather than by his short-term exposure to mustard gas 51 years ago.

55. The Veterans' Administration gave plaintiff a 100% disability rating under a VA regulation which awards presumptive benefits for certain diseases to veterans who participated in full-body exposure to mustard gas in chamber tests or field experiments. 38 C.F.R. § 3.316.

56. Through this regulation, the United States has incorporated into the Veterans Benefits Act a compensation scheme to provide medical care to veterans who have certain enumerated conditions that can be caused by mustard gas without requiring proof of a causal connection. Under the same regulation, veterans who are disabled as a result of any of the enumerated conditions may also receive a disability rating which may entitle them to receive monetary benefits in addition to medical care at VA health facilities.

57. Plaintiff is receiving full VA benefits as a result of the VA's 100% disability rating, which include medical care at any VA health facility. He is now receiving government benefits of approximately $1,800.00 dollars per month.

58. Plaintiff has never been refused care at any VA facility.

59. Dr. Welch testified that plaintiff has received the proper medical care for his conditions.

60. Dr. Susan Mather, Assistant Chief Medical Director for Environmental Medicine and Public Health in the Veterans' Health Administration, Department of Veterans Affairs, testified that, prior to 1993, the Department of Veterans Affairs did not have a program to study the possible adverse health effects that might be attributable to exposure of the servicemen who participated in the World War II testing of mustard gas and Lewisite.

61. Dr. Mather also testified that prior to 1993, the Department of Veterans Affairs did not have a program to warn the servicemen who participated in the World War II testing that they were exposed to mustard gas or Lewisite and might experience adverse health effects attributable to their exposure.

62. In addition, Dr. Mather testified that there is no mandatory regulation which required the Department of Veterans Affairs to warn test participants of the long term health effects of exposure to mustard gas.

63. Dr. Mather testified that the decision whether to institute a program to warn veterans who participated in mustard gas testing would require consideration of a number of factors, including the potential effects on each individual, the method in which to locate and inform each individual, the necessity of a screening program, the desirability of follow-up testing, and the provision of benefits and treatment to each individual.

### Conclusions of Law

1. Under the Federal Tort Claims Act, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, on claims against the government for personal injuries "caused by the negligent or wrongful act ... [of its employees] while acting in the scope of [their] ... employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act of omission occurred." 28 U.S.C. § 1346(b).

2. The Federal District Courts have exclusive jurisdiction to hear Federal Tort Claims Act actions. 28 U.S.C. § 1346(b). Therefore, this Court has proper jurisdiction over this case and over these parties.

3. Federal Tort Claims Act actions may be prosecuted in the judicial district in which the Plaintiff resides. Therefore, Venue is proper in this Court.

4. The Plaintiffs seek damages only for those acts or omissions of the government which took place after James Lewis' discharge in 1963. Therefore, the doctrine of sovereign immunity, which would bar the Plaintiffs from recovering for any claim arising before January 1, 1945, does not apply to bar the Plaintiffs' claims.

5. The Plaintiffs' cause of action for negligent failure to warn arose, if at all, at the time of his exposure to mustard gas in 1943.

6. The government's failure to warn the plaintiff of the long-term health effects of his mustard gas exposure after the Plaintiff's discharge in 1963 did not give rise to a new tort and a new cause of action.

7. Therefore, the Plaintiffs' claims for post-discharge negligence fail to state a claim upon which relief can be granted.

8. The doctrine of *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), also bars any claim by a serviceman who is injured by the government where the injury arose out of or was incident to service.

9. Because the Plaintiff was a serviceman at the time of his injury, and because he his injury arose out of and was incident to his service, his claim is barred by the doctrine of *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950).

10. Mrs. Lewis' claim for loss of consortium is derivative of Mr. Lewis' claims for negligence and is therefore also barred under the doctrine of *Feres. Kendrick v. United States,* 877 F.2d 1201, 1206–07 (4th Cir.1989).

11. The discretionary function doctrine is an exception to the limited waiver of sovereign immunity found in the Federal Tort Claims Act. It provides that the Federal Tort Claims Act shall not apply any claim based on the performance or failure to perform a discretionary function or duty on the part of any federal employee or agency. 28 U.S.C. § 2680(a).

12. Whether the performance of some act is discretionary or not depends on whether some mandatory regulations requires some specific course of conduct and whether the government's decision is of the type that normally involves considerations of public policy. *Baum v. United States,* 986 F.2d 716 (4th Cir.1993).

13. Establishing a program to warn discharged veterans of health risks of which the government becomes aware after their discharge and which could potentially aggravate the veterans' service related disabilities

is inherently grounded in policy considerations.

14.   Because there are no mandatory regulations, laws or rules which require the government to warn the participants in the mustard gas tests of the long-term health effects after 1963, and because the decision whether to warn the participants is a decision of the type that normally involves considerations of public policy, the claim of the Plaintiff is barred by the discretionary function exception to the Federal Tort Claims Act.   See 28 U.S.C. § 2680(a);   *Baum v. United States,* 986 F.2d 716 (4th Cir.1993).

THEREFORE this Court finds for the Defendants and against the Plaintiffs on all Causes of Action before the Court.

IT IS SO ORDERED.