**W.C. & A.N. MILLER COMPANIES,**
Plaintiff,

v.

**UNITED STATES of America, Defendant.**

Civil Action No. 96–00453.

United States District Court,
District of Columbia.

March 21, 1997.

Amy L. Edwards and Christopher A. Myers, Holland & Knight, Washington, DC, for Plaintiff.

Roderick L. Thomas, Assistant United States Attorney, Eric H. Holder, Jr., United States Attorney, on the briefs, and Jeffrey D. Smith, Major, United States Army, of counsel, for Defendant.

## MEMORANDUM OPINION

SPORKIN, District Judge.

### INTRODUCTION

On March 8, 1996, the plaintiff W.C. & A.N. Miller Companies ("Miller") filed this action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*, for damages allegedly arising from the United States Army's burial of munitions [1] during World War I on leased land in northwest Washington in the District of Columbia. Compl. ¶¶ 1–5. These munitions initially were discovered by Miller in January 1993, when Miller was excavating a trench for utilities

---

1. The Complaint alleges that the Army buried intact munitions, assorted ordnance-related debris, and laboratory material, including scrap metal and contaminated laboratory glass. Compl. ¶ 15. The Court shall refer to the buried material collectively as "munitions."

for a new home on land it owned. Compl. ¶ 13.

The defendant has moved for dismissal or, in the alternative, for summary judgment on the grounds that: (1) the Court lacks subject matter jurisdiction over the plaintiff's claims; (2) the claims are barred by the applicable statute of limitations; and (3) the plaintiff has failed to state a claim upon which relief can be granted. The plaintiff opposes the defendant's motion. Based on the pleadings, the entire record herein, the law applicable thereto, and for the reasons expressed below, the Court will deny the defendant's Motion, will hold that the defendant breached its duty of care to the plaintiff to warn of the buried munitions, and will set a schedule to dispose of the remaining issue of damages in this case.

## BACKGROUND

On April 30, 1917, in a letter addressed to President Woodrow Wilson, American University's board of trustees offered the United States Government the use of its 91–acre campus in northwest Washington to support the war effort against Germany. *See* Martin K. Gordon, Barry R. Sude, Ruth Ann Overbeck & Charles Hendricks, *A Brief History of the American University Experiment Station and U.S. Navy Bomb Disposal School. American University* (Office of History Headquarters, U.S. Army Corps of Engineers, June 1994) at 15. On May 28, 1917, the Army Corps of Engineers established Camp American University (later renamed Camp Leach) on a portion of the property. The Bureau of Mines established the American University Experiment Station ("AUES") on the campus a short time later. *Id.* at 16–19. Control of AUES was transferred by President Wilson to the War Department's Gas Service (later called the Chemical Warfare Service) on June 25, 1918. *Id.*[2]

By summer and fall of 1918, there were 12 research sections and more than 1,000 personnel researching war gas problems at the AUES. *Id.* at 19–20. By the end of the war,

there were nearly 2,000 military and civilian personnel supporting the AUES's Research Division. *Id.* at 20. When space was required for additional drill fields and training trenches, the Construction Division of the Quartermaster Corps leased adjoining properties owned by area residents. There were 153 structures of various sizes and types spread throughout the campus and adjoining properties, including privately-owned tracts. *Id.* at 23.

The American University land and surrounding properties became the site of a massive training, research, and testing ground for conventional and chemical warfare defensive and offensive techniques. Projects were conducted related to the development, testing, and manufacture of gases, toxic and incendiary munitions, smoke mixtures, and signal flares. Field tests were conducted using gas shells, smoke clouds and equipment, mortars and Liven's projectiles, hand grenades, incendiary and flaming liquid weapons, and signal lights. *Id.* at 17–19.

On November 9, 1918, the German government officially accepted President Wilson's terms for an armistice, and two days later, the fighting in Europe ceased. *Id.* at 31. On November 29, 1918, the War Department ordered the immediate and complete demobilization of the Chemical Warfare Service. Under this order, the AUES suffered a drastic reduction in personnel and a dismantling of much of its research and manufacturing equipment for shipment to the Edgewood–Arsenal. A year later, the War Department ordered the Chemical Warfare Service to immediately vacate the AUES. It transferred personnel, equipment, and material to Edgewood Arsenal. *Id.* at 35.

In 1986, in response to inquiries from American University, *see* Def's Mot., Exh. 11, the United States contracted with the Bionetics Corporation to conduct a photographic analysis of the area, *see id.* Exh. 12. Pursuant to Contract No. 68–03–3161, Bionetics produced a report in July 1986, which indi-

---

**2.** Camp Leach and AUES were distinct entities. The property subject to the present suit is that formerly occupied by AUES.

cated "possible burial sites" of munitions and gas. *Id.* Exh. 12 at 14.

The Army also conducted its own document review in 1986 to determine whether historical records reflected a large-scale burial of munitions on the AUES. *Id.* Exh. 14–15. The document review produced "no official documentation of the alleged large-scale burial of munitions on the [AUES]." *Id.* Exh. 14 at 1. However, the review concluded that "it can be inferred that laboratory quantities of toxic materials were disposed of onsite prior to or following the documented transfer of personnel and equipment from the [AUES] to Edgewood Arsenal in November 1919." *Id.* The review concluded that official correspondence from the period "strongly suggests that all munitions were removed to Edgewood Arsenal," but that the review "could not disprove the possibility that some materials remain buried on or near Camp American University [i.e., Camp Leach]." *Id.* Exh. 15 at 1. The review further concluded: "If any materials were buried, they were probably small quantities of laboratory or experimental materials. All sources we found were inconsistent with the notion of substantial quantities of any munitions or the components for munitions existing at [American University]." *Id.* Exh. 15 at 3.[3]

\* \* \*

The plaintiff Miller is a family-owned real estate business operating in the Washington metropolitan area. Compl. ¶ 2. The plaintiff alleges that, in or around 1927, it began to accumulate various parcels of land in northwest Washington. The plaintiff ultimately acquired approximately 300 acres of land in this area over a period of several years. This area later became known as Spring Valley. *Id.* ¶ 6. Over the years, Miller has developed its Spring Valley holdings into housing, commercial, and retail space. *Id.* ¶ 7.

On or about January 5, 1993, Miller was excavating a trench for utilities for a new home on land Miller owned in Spring Valley. It discovered objects that appeared to be old munitions. Miller promptly notified the District of Columbia government, which in turn notified the United States Army. Compl. ¶ 13. The Army promptly assumed responsibility for the situation and conducted a response action pursuant to the Defense Environmental Restoration Act, 10 U.S.C. §§ 2701–07, and the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*

The Army conducted its investigation in two phases. Phase I was the emergency response phase of the investigation, which lasted 27 days, from January 5, 1993 to February 2, 1993. Compl. ¶ 14. During Phase I, the Army excavated in and around the area where the objects had been discovered. The Army removed intact munitions, assorted ordnance-related debris, and laboratory material, all from the World War I era. Compl. ¶ 15. During Phase II of the investigation, which extended into 1995, the Army continued to investigate for buried munitions in an area over 600 acres in size. The Army discovered additional live munitions and spent ordnance and debris. Compl. ¶ 18–19. During both phases I and II, households were evacuated from the area.

On March 8, 1996, Miller filed the present suit under the Federal Tort Claims Act (FTCA). Miller claims that the Army was negligent in burying munitions during 1917–1920, failing to mark or warn the public that there were buried munitions, investigating in 1986, and failing to remove the munitions prior to 1993. Compl. ¶ 1. Specifically, Miller alleges that these acts and omissions: (1) interfered with Miller's use and enjoyment of the land and constitute a private nuisance; (2) interfered with the public's use and enjoyment of the land and constitute a public nuisance; (3) constituted a breach of the defendant's duty of care to Miller; and (4) constituted a trespass.

Miller seeks damages totaling approximately $14,000,000 for expenses it incurred in assisting the Army during its investigation, in defending itself against homeowners' legal proceedings, and in combating the effects on its business of the uncertainty in the

---

**3.** The only sources stating that munitions were buried were found to be historically suspect. Both-sources were references in 1921 issues of the AU newspaper, *The American University Courier.* Both sources refer to burying $800,000 worth of munitions at the end of the war, two and a half years earlier. *See* Def's Mot. Exh. 15 at 2–3.

community caused by the discovery of the buried munitions. Compl. ¶ 30–39. Miller does not claim that the Army negligently responded to the discovery of munitions, nor does it claim that any physical harm resulted from those munitions.

On July 19, 1996, the defendant filed the present motion to dismiss or, in the alternative, for summary judgment. First, the defendant asserts that the Court lacks subject matter jurisdiction over this case because the FTCA does not waive the government's sovereign immunity for claims arising from: (a) the defendant's conduct prior to January 1, 1945, the effective date of the FTCA; (b) the conduct of the defendant's independent contractor; and (c) the defendant's conduct that involves "discretionary functions" of the government. Second, the defendant asserts that the statute of limitations bars suit by the plaintiff whose founders knew or should have known of its claims when they purchased the land. Third, the defendant asserts that the Complaint fails to state a claim upon which relief can be granted because under District of Columbia law, a leaseholder owes no duty to a subsequent purchaser of land under nuisance, negligence, or trespass theories. The plaintiff filed an opposition to the present motion on August 12, 1996, to which the defendant replied on September 9, 1996. On September 19, 1996, the plaintiff moved to file a surreply, which the court shall accept, as it addresses issues raised in the defendant's reply.

## DISCUSSION

Dismissal is appropriate when the Court lacks jurisdiction over the subject matter of a claim or when the plaintiff has failed to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(1), (6). Under Rule 12(b)(6), a claim must be dismissed if it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). In evaluating the plaintiff's complaint on a motion to dismiss, the Court must accept the factual allegations as true and draw all reasonable inferences therefrom in favor of the plaintiff. *Maljack Productions, Inc. v. Motion Picture Ass'n of Am., Inc.*, 52 F.3d 373, 375 (D.C.Cir.

1995). At the same time, the Court must not accept inferences drawn by the plaintiff if they are unsupported by the facts, nor must the Court accept purely legal conclusions masked as factual allegations. *Id.*

If, on a motion to dismiss pursuant to 12(b)(6), matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56. Fed.R.Civ.P. 12(b). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). An issue must be both genuine and material to preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2509–10. An issue is genuine if there is sufficient evidence to support a rational finding either way. In making this determination, the non-movant's evidence "is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id.* at 255, 106 S.Ct. at 2513. "Only disputes of facts that might affect the outcome of the suit ... will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. at 2510.

## I. THE COURT HAS SUBJECT MATTER JURISDICTION OVER THE PLAINTIFF'S CLAIMS ARISING FROM THE DEFENDANT'S FAILURE TO WARN OF THE BURIED MUNITIONS.

### A. The plaintiff's claims are not barred by the FTCA's "effective date" or "independent contractor" provisions; The plaintiff's claims arising from the defendant's failure to warn of buried munitions are not barred by the discretionary function provision.

As a sovereign, the United States is immune from suit except if it has consented to be sued. *United States v. Dalm*, 494 U.S.

596, 608, 110 S.Ct. 1361, 1368, 108 L.Ed.2d 548 (1990). The FTCA waives sovereign immunity for civil suits against the United States

for money damages ... for injury or loss of property, or personal injury ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his [or her] office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).

The FTCA contains several exceptions to this waiver of sovereign immunity. *Berkovitz v. United States,* 486 U.S. 531, 535, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988). If a plaintiff's claims are excepted from the FTCA's waiver of sovereign immunity, the Court lacks subject matter jurisdiction over those claims. *See Cope v. Scott,* 45 F.3d 445, 448 (D.C.Cir.1995).

Exceptions to the waiver of sovereign immunity are established by the FTCA's effective date, independent contractor, and discretionary function provisions, each of which the defendant cites as a bar to the present suit. The Court concludes that the effective date and independent contractor provisions do not bar suit here. The discretionary function provision bars suit with respect to the defendant's burial of munitions, investigation, and failure to remove the munitions; however, it does not bar suit with respect to the defendant's failure to warn of the buried munitions.

i. The FTCA's "Effective Date" Provision Does Not Bar Claims Arising From The Defendant's Conduct Prior To January 1, 1945 Because The Plaintiff's Claims Did Not Accrue Until After That Date; The FTCA Establishes Jurisdiction On The Basis Of When A Claim Accrues, Rather Than When The Tortious Conduct Occurs.

By its effective date provision, the FTCA confers jurisdiction in district court for civil actions for money damages against the United States on

claims ... accruing on and after January 1, 1945 ... in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). It is the defendant's position that the FTCA does not apply to claims arising out of acts or omissions that occurred before 1945, even if the injuries resulting from those acts or omissions occurred after 1945. According to the defendant, any claims arising from the Army's burial of munitions during the 1917–1920 time period are barred by the FTCA's effective date provision.

The Court begins with the presumption that Congressional intent is expressed by the plain meaning of the words chosen. *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 590–91, 7 L.Ed.2d 492 (1962). In the provision at issue, Congress used the two phrases "claims ... accruing" and "act or omission occurred" in the same sentence. Notably, Congress chose to include the phrase "on and after January 1, 1945" directly after the phrase "claims ... accruing," thereby logically indicating that the words "on and after January 1, 1945" modify the phrase "claims ... accruing" rather than the phrase "act or omission occurred." Had Congress intended that the act or omission at issue must occur after 1945, as the defendant suggests, it would have used an altogether different statutory construction.

 The phrases "claims ... accruing" and "act or omission occurring" are distinct. By specifying that a claim accrues on a certain date by virtue of some act or omission that occurred in a certain place, Congress intended to distinguish the place of the act from that act's operative effect. It is the operative effect, or injury, which measures when a claim accrues[4]. Thus, under the plain meaning of the words chosen, Congress

---

4. The question when a claim accrues has been held to be a matter of federal law for purposes to the FTCA's statute of limitations. *Kossick v. United States,* 330 F.2d 933 (2d Cir.1964); *Quin-* *ton v. United States,* 304 F.2d 234 (5th Cir.1962); *Maryland v. United States,* 165 F.2d 869 (4th Cir.1947). However, whether or not a claim has accrued is a matter of state law in accordance

intended that the FTCA confer jurisdiction over claims for which the injury occurred after January 1, 1945, regardless of when the act or omission complained of occurred.

Courts that have focused on the FTCA's effective date provision have rejected the government's position and have held that as long as the injury occurred subsequent to January 1, 1945, a district court has jurisdiction, even if the tortious acts or omissions took place prior to that date. *See Carnes v. United States,* 186 F.2d 648 (10th Cir.1951) (FTCA permitted suit when child who took home an explosive device from a crashed Army airplane in 1944 was injured in February 1945 when the device exploded); *In re Silver Bridge Disaster Litigation,* 381 F.Supp. 931 (S.D.W.Va.1974) (claim of negligence with respect to Army's building of bridge in 1928 accrued in 1967 when the bridge collapsed). The government has not cited any persuasive authority to the contrary.

■ In accordance with the plain language of the FTCA, the plaintiff's claims will not barred by the effective date provision just because those claims arise from acts and omissions that occurred before January 1, 1945. The effective date provision establishes jurisdiction on the basis of when the claims accrued rather than when the allegedly tortious conduct occurred.

ii. The Plaintiff's Claims Arising From The Allegedly Negligent Investigation In 1993 Are Not Barred By The Independent Contractor Provision Of The FTCA Because The Plaintiff's Challenge Is To The Defendant's Conduct, Not To The Contractor's Conduct.

■ Liability under the FTCA must be premised upon a "negligent or wrongful act

or omission of any *employee of the Government.*" 28 U.S.C. § 1346(b) (emphasis added). The FTCA defines "employee of the government" to include "officers or employees of any federal agency," and defines "federal agency" to include

> the executive department, the judicial and legislative branches, the military departments, independent establishments of the United states, and corporations primarily acting as instrumentalities or agencies of the United States, *but does not include any contractor with the United States.*

28 U.S.C. § 2671 (emphasis added). Thus, the FTCA adopts the common-law distinction between the liability of an employer for the negligent acts of its employees and for the negligent acts of those with whom it contracts. *Logue v. United States,* 412 U.S. 521, 526, 93 S.Ct. 2215, 2218–19, 37 L.Ed.2d 121 (1973). In order for the government to be liable under the FTCA, it must be shown that the acts or omissions complained of were taken by an employee of the government.

■ The defendant asserts that, to the extent the plaintiff bases its action on the 1986 Photographic and Historical Report, it is immune from suit under the independent contractor provision. However, the defendant's invocation of the independent contractor provision is inappropriate in this case because the plaintiff's complaint does not challenge the actions of the independent contractor. Rather, the plaintiff claims that the Army was negligent in failing to take appropriate action after learning from its independent contractor that there were "possible burial sites, shell and bomb pits, trenches and possible test areas." This claim is not barred by the independent contractor provision.

---

with § 1346(b). *See Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). District of Columbia case law holds that when the fact of an injury can be readily determined, a claim accrues at the time the injury actually occurs. *Farris v. Compton,* 652 A.2d 49, 54 (D.C.App.1994). However, if the existence of an injury is not readily apparent, the case law is clear that the claim does not accrue until the plaintiff, exercising due diligence, has "discovered or reasonably should have discovered all of the essential elements of [its] possible cause of

action, i.e., duty, breach, causation and damages." Id. It is generally understood that the terminology "claim accrued" refers to the point at which damages are vested or injury has occurred, and a cause of action may be maintained. Black's Law Dictionary 37, 314 (4th ed.1968). A claim "accrues" when the negligent act or omission complained of has had an impact that results or will result in injury. *See In re Silver Bridge,* 381 F.Supp. 931, 940 (S.D.W.Va.1974) (citing W. Prosser, Law of Torts § 30 at 143–44 (4th ed.1971)).

iii. The Discretionary Function Provision Of The FTCA Bars The Plaintiff's Claims Based On The Defendant's Allegedly Wrongful Burial of Munitions During 1917–1920, its Allegedly Negligent Investigation in 1986; And its Failure To Remove The Munitions Prior To 1993. The Discretionary Function Provision Does Not Bar Claims Based On the Defendant's Failure To Mark Or Warn That There Were Buried Munitions.

■ The FTCA excepts from its provisions

[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, *or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government whether or not the discretion involved be abused.*

28 U.S.C. § 2680(a) (emphasis added). This exception to the Court's jurisdiction under the FTCA is known as the "discretionary function" exception and "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United State v. S.A. Empresa de Viacao Aerea Rio Grandense,* 467 U.S. 797, 808, 104 S.Ct. 2755, 2762, 81 L.Ed.2d 660 (1984) (*"Varig Airlines "*). It "was designed to prevent the courts from 'second guessing,' through decisions in tort actions, the way that government officials choose to balance economic, social, and political factors as they carry out their official duties." *Cope v. Scott,* 45 F.3d 445, 448 (D.C.Cir.1995) (citing *Varig Airlines,* 467 U.S. at 814, 104 S.Ct. at 2764–65).

■ The Supreme Court has defined a two-part test for deciding whether the discretionary function exception applies in a particular case. *Id.* at 448. Under this test, the Court must first determine whether any "federal statute, regulation, or policy specifically prescribes a course of action for an

employee to follow." *Id.* If a specific directive exists, then the federal employee had no "choice" and no rightful option but to adhere to the directive. *Id.* However, if no specific directive exists, the action does involve judgment and the Court must make a second determination whether that judgment is of the kind that the FTCA exception was designed to shield from liability, that is, a decision grounded in social, economic, or political policy. *Id.*

The second determination asks not whether there was an "actual, specific decision involving the balancing of competing policy considerations" but, rather, whether the "nature" of the decision implicates policy analysis. *Id.* at 449. This Circuit has held that a Court must focus on whether the decision is

"fraught with" economic, political, or social judgments. No matter the level at which the decision was made, the nature of the decision, or the impact it had on others, ... the discretionary function exception applies "only where the question is not negligence but social wisdom, not due care but political practicability, not reasonableness, but economic expediency.' "

*Id.* at 450 (quoting *Sami v. United States,* 617 F.2d 755, 766 (D.C.Cir.1979)). Thus, if the exception is found to apply, it makes no difference whether the governmental actor indeed was negligent. *See* 28 U.S.C. § 2680(a).

a. *No applicable federal statute, regulation, or policy specifically prescribed a course of action for the government to follow in this case.*

The parties disagree whether applicable law specifically prescribed a course of action with respect to the actions complained of here. The plaintiff argues that the defendant's actions in burying munitions violated mandatory regulations and orders governing property accountability and responsibility. The defendant counters that its conduct was consistent with existing policies.

The plaintiff states that the Army was under orders to ship all equipment and supplies to Edgewood Arsenal. However, that

proposition has not been supported by any documentation. The plaintiff also states that the defendant's burial of munitions violated 1913 regulations pertaining to public property accountability. According to the plaintiff's witness Richard H. Groves [5], a retired Army Lieutenant General, an officer in the relevant time period had only four options regarding the disposal of ordinance: (1) to retain it under his control and remain accountable; (2) to turn it in, if serviceable; (3) to expend it, if consumable, and certify that he had done so; or (4) to salvage unserviceable property and dispose of it after inspection and a survey [6]. Groves Dec. ¶ 10(0). In order to remove the government's conduct from the realm of discretion, a statute or regulation must be both mandatory and specific, such that "there is no element of judgment or choice" and the "employee has no rightful option but to adhere to that directive." *Gaubert*, 499 U.S. at 322, 111 S.Ct. at 1273. The plaintiff's reading of the 1913 regulations itself proves that the regulations permit an element of choice in disposing of property.

The plaintiff also states that a lease for the subject property may have provided a mandatory prescription. Groves Decl. ¶ 10(A–C). However, in his declaration, Groves states that no lease for the subject property has

been found. Thus, it is uncertain whether a lease even existed.[7]

The defendant, on the other hand, states that during the relevant time period, burial was an accepted method for the permanent disposition of munitions. The government relies on American Expeditionary Force Regulation Number 253, dated November 1917, which provided that gas shells, bombs, and grenades should be buried in the ground 3 to 3–1/2 feet deep, and should not be thrown into water. Def's Mot. Exh. 16 at 31. The government asserts that similar burial guidance was given in January 1918, *see* Exh. 17 at 60, and January 1920, *see* Exh. 18 at 27. The regulations cited by the government do not appear to have had specific application to the disposal of munitions at AUES; rather, these regulations appear to have related to combat forces and battlefield activity, permitting the burial during a gas attack to protect combat troops.

Neither party has established that the government violated or followed any mandatory and specific statute, regulation, or policy governing the burial of munitions in connection with the subject property.[8] Accordingly, the Court shall turn to the second determination, that is, whether the conduct at issue here is of the kind that the discretionary function exception was designed to shield.

5. The defendant requests that the Declaration of the plaintiff's witness Groves be stricken or disregarded because, among other reasons, there is no basis for concluding that his Army experience qualifies him as an expert concerning World War I or Army regulations or policies. Even considering Groves' Declaration, however, neither Groves' testimony nor the other evidence of record is sufficient to establish jurisdiction over this action.

6. The government asserts that a "fifth" opinion was available in accordance with the 1913 regulations, that is, "when practicable," inspectors could cause the destruction of property "at or near the place of inspection." *See* Def's Reply at 16 & n. 16.

7. The plaintiff states that the contents of a possible lease for the subject property would have provided that the government must surrender the premises in original condition. However, to support this speculation, the plaintiff relies on an unexecuted document. *See* Groves Ded., Att. 5. The defendant, on the other hand, points to an executed 1918 lease involving property leased to

the Army, in which the government agreed that "the land, so far as practicable, shall be restored to its original condition." *See* Groves Ded., Att. 5. Such language is not mandatory and specific. Additionally, the government points out that some of the Army leases contained indemnification clauses protecting the United States. *See* Groves Ded., Att. 3.

8. The parties have cited a memorandum from the Adjutant General of the Army, dated December 23, 1918, concerning the discontinuance of the use of Camp Leach. In that memorandum, the Commanding Officer at Camp Leach was ordered to "dispose of all supplies, equipment and transportation now at Camp Leach in such a way as will be for the *best interest of the Government,* and salvage such property *as is considered necessary* to salvage for the *best interests of the Government* ..." Def's Exh. 23. These directions, so far as they may relate to the subject property, are discretionary and do not provide a mandatory and specific prescription.

**1240**

b. *The burial of the munitions, the 1986 investigation, and the failure to remove the munitions prior to 1993 are types of conduct that implicate "social, economic, or political judgment" and, therefore, beyond the reach of the FTCA.*

Decisions regarding the disposal of munitions by the Army are of the type that require a balancing of objectives sought to be obtained against such considerations as staffing, funding, national security, and safety. *Cf. Boyle v. United Technologies Corp.*, 487 U.S. 500, 511, 108 S.Ct. 2510, 2518, 101 L.Ed.2d 442 (1988) ("selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function [since it] often involves ... judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness."); *Varig Airlines*, 467 U.S. at 820, 104 S.Ct. at 2767–68 (government agents necessarily take calculated risks in order to make policy judgments regarding safety and in the advancement of a governmental purpose). Accordingly, numerous courts have applied the discretionary function exception in the context of military activities and the Government's handling and disposal of hazardous materials. *See Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) (claims arising from distribution of fertilizer for export to devastated areas after World War II barred by discretionary function exception); *Kirchmann v. United States*, 8 F.3d 1273, 1278 (8th Cir.1993) (discretionary function exception applied to action based on groundwater contamination during construction of missile site); *Industria Panificadora, S.A. v. United States*, 957 F.2d 886, 887 (D.C.Cir.) (decisions concerning the "allocation of military and law enforcement resources [are] sheltered by the [discretionary function] exception"), *cert. denied*, 506 U.S. 908, 113 S.Ct. 304, 121 L.Ed.2d 227 (1992); *Allen v. United States*, 816 F.2d 1417 (10th Cir.1987) (Atomic Energy Commission's decision involved in carrying out programs relating to open-air atomic bomb test were within discretionary function exception), *cert. denied*, 484 U.S. 1004, 108 S.Ct. 694, 98 L.Ed.2d 647 (1988); *Laurence v. United States*, 851 F.Supp. 1445, 1450–52 (N.D.Cal. 1994) (discretionary function applied to action based upon alleged contaminated soil used in construction of housing complex to support World War II emergency need), *aff'd*, 59 F.3d 112 (9th Cir.1995) (affirming on independent contractor exception); *Bowman v. United States*, 848 F.Supp. 979, 985 (M.D.Fla.1994) (Navy's judgment on the method for disposing of pyridine protected under discretionary function exception to FTCA); *see also* David S. Fishback and Gail Killefer, *The Discretionary Function Exception to the Federal Tort Claims Act*, 25 Idaho L.Rev. 291 (1988–89).

Whether or not the Army exercised the best judgment in disposing of its munitions—including its decision to bury munitions on private land, to leave the munitions buried until 1993, and to respond to its 1986 investigation as it did—are actions not properly subject to the Court's inquiry in a FTCA suit. Congress has provided that the Court may not "second guess" those types of judgments by way of a tort action.

c. *The failure to mark or warn of the buried munitions does not fall within the discretionary function exception to the FTCA.*

In *Cope v. Scott*, 45 F.3d 445 (D.C.Cir. 1995), the District of Columbia Circuit determined that, although the Park Service's failure to maintain an adequate skid resistance on a road surface fell within the discretionary function exception, its failure to post adequate warning signs about the nature of the surface did not. *Cope*, 45 F.3d at 450–51. *Cope* explained that the failure to warn of known dangers falls within the discretionary function exception only when it is part of an overall discretionary policy or program. *Id.* Consistent with this approach, Court's have recognized that the government's decision whether or not to issue warnings is protected by the discretionary function exception only when that decision involves policy considerations. *See Dalehite*, 346 U.S. at 15, 73 S.Ct. at 956 (discretionary function exception barred allegations that the government failed to warn of the dangers of the fertilizer it

selected for use in a post-war program); *Wells v. United States,* 851 F.2d 1471 (D.C.Cir.1988) (discretionary function applied to claim that EPA negligently regulated and communicated knowledge of public health risks and lead pollution dangers in plaintiffs' neighborhoods), *cert. denied,* 488 U.S. 1029, 109 S.Ct. 836, 102 L.Ed.2d 969 (1989); *Allen,* 816 F.2d at 1423 (discretionary function barred failure to warn and negligence allegations associated with open-air atomic bomb testing); *Smith v. Johns–Manville,* 795 F.2d 301 (3d Cir.1986) (discretionary function barred claim based on the GSA's disposition of asbestos and alleged failure to warn); *Begay v. United States,* 768 F.2d 1059, 1065 (9th Cir.1985) (decision of U.S. public health service not to disclose to miners the possible health hazards of working in uranium mines protected by discretionary function exception); *Cisco v. United States,* 768 F.2d 788, 789 (7th Cir.1985) (failure of EPA to warn neighborhood residents that dirt used in local landfill had been contaminated with toxic chemicals and failure to require that dirt be removed was protected by discretionary function); *Wainwright v. Washington Metro. Area Transit Auth.,* 903 F.Supp. 133, 138 (D.D.C.1995) (duty to warn a discretionary function for which government retains immunity); *Western Greenhouses v. United States,* 878 F.Supp. 917, 927–29 (N.D.Tex.1995) (Air Force decisions concerning investigation, monitoring, and public notification of potential contamination protected by discretionary function); *Lewis v. United States Navy,* 865 F.Supp. 294, 299–300 (D.S.C.1994) (veteran's claim for failure to warn of long-term health effects of mustard gas exposure barred); *Bowman,* 848 F.Supp. at 979 (allegations associated with navy's failure to warn of buried pyridine barred by discretionary function exception); *see also* David S. Fishback and Gail Killefer, *The Discretionary Function Exception to the Federal Tort Claims Act,* 25 Idaho L.Rev. 291 (1988–89).

■ Here, the Army's decision not to warn that it had buried munitions on private land is not the type of decision that involves social, economic, or policy considerations. *Accord Faber v. United States,* 56 F.3d 1122, 1125 (9th Cir.1995) (Forest Service's failure to warn of specific, known dangers in a national forest involved considerations of safety, not public policy, and did not fall within exception); *Sutton v. Earles,* 26 F.3d 903, 910 (9th Cir.1994) (Navy's decision not to warn of a known water hazard was not the kind of social, economic, or policy decision the exception was intended to protect); *Andrulonis v. United States,* 952 F.2d 652, 655 (2nd Cir.1991) (government scientist's failure to warn of obvious dangerous conditions in state laboratory studying government supplied rabies virus could not implicate any policy considerations and was not protected), *cert. denied,* 505 U.S. 1204, 112 S.Ct. 2992, 120 L.Ed.2d 869 (1992); *Summers v. United States,* 905 F.2d 1212 (9th Cir.1990) (Forest Service's failure to provide adequate warnings about fire rings on a beach in a national park not protected by the discretionary function exception); *Boyd v. United States,* 881 F.2d 895, 898 (10th Cir.1989) (alleged failure to warn swimmers of dangerous conditions in swimming area does not implicate social, economic, or political policy judgments); *Kennewick Irrigation District v. United States,* 880 F.2d 1018, 1031–32 (9th Cir.1989) (decisions by contracting officer during construction of irrigation canal concerning whether to remove unsuitable ground material were based not on policy judgments but on technical, scientific, engineering considerations and therefore did not fall within exception); *ARA Leisure Servs. v. United States,* 831 F.2d 193 (9th Cir.1987) (Park Service's failure to maintain portion of road in safe condition not protected by exception); *Smith v. United States,* 546 F.2d 872 (10th Cir.1976) (Park Service's failure to post signs warning of danger of collapsing thermal pool crusts not protected); *Noel v. United States,* 893 F.Supp. 1410, 1420–22 (N.D.Cal.1995) (Navy's decision not to put barriers around holes in tarmac during air base open house was motivated solely by safety considerations, so not protected by the exception; Navy's failure to execute its self-imposed crowd control plan did not involve a balancing of social, economic, or political policy considerations). Although the Army states that its failure to warn of buried munitions involved economic and social considerations, there is evidence that the Army did mark

and fence off some hazards left on the formerly leased properties. *See* Martin K. Gordon, Barry R. Sude, Ruth Ann Overbeck & Charles Hendricks, *A Brief History of the American University Experiment Station and U.S. Navy Bomb Disposal School.* American University (Office of History Headquarters, U.S. Army Corps of Engineers, June 1994) at 36. Thus, the Army had already made a decision to warn. Its failure to effectuate that decision properly was not itself the product of a policy decision. *See Cope,* 45 F.3d at 452 (when Park Service already posted signs in an effort to warn, the placement of additional or different signs does not implicate economic, social, or political concerns); *cf. Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (Coast Guard, having undertaken to provide lighthouse service, had a duty to use due care to make certain that the lighthouse was kept in good working order and to repair light or give warning that it was not functioning).

## II. THE PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE FTCA'S STATUTE OF LIMITATIONS.

The defendant asserts that the plaintiff's claims are barred by the FTCA's two-year statute of limitations. The FTCA's statute of limitations, like its effective date provision, runs from the date the claim accrues. 28 U.S.C. § 2401(b). The defendant asserts that the plaintiff's claims accrued when Miller's founders purchased the property in question because, according to the defendant, the plaintiff's founders should have been aware of the Army's activities when they purchased the property, based on evidence that some reports appeared in the local press.

The Court rejects this notion. Even if the founders knew that the property was a testing site, there is no evidence to suggest that they knew or had reason to know that the Army had buried munitions beneath the surface of property. The defendant's own document review reported that there was no official documentation of the large-scale burial of munitions and that those munitions reportedly were moved to Edgewood Arsenal. In the present case, the discovery of all of the essential elements of the plaintiff's possible causes of action did not occur until after the munitions were discovered in 1993.

## III. THE PLAINTIFF HAS STATED A CAUSE OF ACTION FOR NEGLIGENCE UNDER DISTRICT OF COLUMBIA LAW; THE DEFENDANT HAD A DUTY TO WARN OF BURIED MUNITIONS.

Pursuant to the FTCA, the United States is subject to suit only "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The applicable law here is the District of Columbia Law. Based on the Court's rulings above, the Court need only consider whether the plaintiff has stated a cause of action under District of Columbia law in negligence with respect to the plaintiff's failure to warn of buried munitions.

To prevail in a cause of action for negligence, a plaintiff must prove duty, a breach of that duty, causation, and damages. *See Art Metal—U.S.A., Inc. v. United States,* 753 F.2d 1151, 1157 (D.C.Cir.1985). The defendant asserts that it did not owe a duty to the plaintiff to warn of buried munitions.

The District of Columbia Court of Appeals has not addressed the question whether a subsequent occupier of property has a cause of action in negligence for damages against a former occupant whose activities during its occupancy allegedly caused the property to become contaminated by chemicals. *See 325–343 E. 56th Street Corp. v. Mobil Oil Corp.,* 906 F.Supp. 669, 676 (D.D.C.1995) (Urbina, J.). To decide this question, this Court must predict what the District of Columbia would hold under these circumstances. *Id.* (citing *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). The *Mobil* decision of this court, addressing this very issue, adopted the legal principles established by the Maryland Court of Appeals in *Rosenblatt v. Exxon Co.,* 335 Md. 58, 642 A.2d 180 (1994). *See Mobil,* 906 F.Supp. at 676 (citing *Gerace v. Liberty Mutual Ins. Co.,* 264 F.Supp. 95, 97 (D.D.C.1966)

("[S]ince the District of Columbia derives its common law from Maryland, decisions of Maryland courts on points not determined by the court of Appeals of the District of Columbia or by the Supreme Court of the United states are, if not completely controlling, nevertheless, of great weight, of greater weight than the decisions of other states.")). After careful consideration, the court adopts those sound principles in the present case.

 The question whether a duty is owed is a question of law to be determined by the court. *See Rosenblatt*, 642 A.2d at 188 (citing Prosser & Keeton, Law of Torts, § 45 at 320 (5th ed.1984)).

> In determining the existence of a duty owed to a plaintiff, [courts] have applied a "foreseeability of harm" test, which is based on the recognition that duty must be limited to avoid liability for unreasonably remote consequences.... Inherent also in the concept of duty is the concept of a relationship between the parties out of which the duty arises.... [U]ltimately, the determination of whether a duty should be imposed is made by weighing the various policy considerations and reaching a conclusion that the plaintiff's interest are, or are not, entitled to legal protection against the conduct of the defendant.... The imposition of a duty upon one to another serves to balance the burdens between the parties in avoiding the harm.

*Id.* at 189. Applying these principles to the present case, the Court concludes that, as a matter of law, the defendant owed a duty to warn the plaintiff, a subsequent occupant of the land, of the buried munitions.

When it buried live munitions, the Army had in effect "booby-trapped" the land. The live munitions were buried so close to the surface that subsequent preparation of the land for development by the plaintiffs resulted in unearthing of the munitions. It had to be obvious to the Army when it embarked on its disposal project that any subsequent user of the land may well need to excavate below the surface for subsequent construction. It should have been recognized that such a reasonable use of the land obviously would have exposed the subsequent user to serious bodily harm or possibly even death if one of the unexploded munitions was discharged inadvertently.

Moreover, the Army was in the best position to warn future occupants. Indeed, there is no basis to conclude that anyone but the Army even knew of the buried munitions; nor is there basis to conclude that the munitions could have been discovered by a future occupant, even if that occupant exercised reasonable diligence with inquiry and inspection. The Army itself concluded that there were no buried munitions after its 1986 investigation.

Clearly, the duty to warn under these circumstances is an absolute necessity. No department of government can so callously conduct itself, placing segments of the public in serious jeopardy, without appropriate warning of the hazards that exist. The land in this case was contaminated and the Army had a duty to clearly warn of that fact. To now attempt to shield itself from its obligations and transfer substantial costs to the plaintiff is unacceptable. Where there is a dispute between two parties as to which party must pay for a loss incurred, it is hornbook law that the party causing the loss is the one that must pay. *Cf. Vincent v. Lake Erie Transp. Co.*, 109 Minn. 456, 124 N.W. 221 (1910) ("[P]ublic necessity, in times of war or peace, may require the taking of private property for public purposes; but under our system of jurisprudence compensation must be made."); *Rylands v. Fletcher*, L.R. 3 H.L. 330 (1868) ("[W]hen one person, .... causes, however innocently, damage to another, it is obviously only just that he should be the party to suffer.")

The Army in this case created the hazard and literally "covered it up." At the least, it had the duty to warn potential users of the property of the high risks to life and property to which subsequent innocent users would be exposed. The Army clearly has responsibility in this case. To transfer its burden to an innocent party can under no circumstances be rationalized. Why the Army has resisted discharging its obligations demanded by the law and the public interest is inexplicable. The risk of these buried munitions simply is not one the public should assume.

1244

The Army had a duty to warn Miller, as a subsequent occupant of the property, that the Army had buried munitions on the property. *Accord T & E Industries. Inc. v. Safety Light Corp.,* 123 N.J. 371, 587 A.2d 1249 (1991) (defendant who contaminated land with radioactive tailings was liable to a subsequent owner of the land); *Mangini v. Aerojet–General Corp.,* 230 Cal.App.3d 1125, 281 Cal.Rptr. 827 (1991) (current landowner has action against prior lessee for damages caused by failure to remove wast rocket fuel from property); *State, Dept., of Environmental Protection v. Ventron Corp.,* 94 N.J. 473, 468 A.2d 150 (1983) (summary judgment in favor of current owner in action against prior owner for dumping abnormally dangerous mercury); *Prospect Indus. Corp. v. Singer Co.,* 238 N.J.Super. 394, 569 A.2d 908 (1989) (prior owner who caused release of PCBs into environment liable to subsequent property owner for costs of cleanup). The Army will be held liable for the breach of its duty to warn.

## CONCLUSION

The defendant breached its duty of care to the plaintiff to warn of buried munitions. The Court will set a status conference to establish a schedule for the resolution of the remaining question of damages. The Court will issue an Order of even date herewith, consistent with the foregoing Memorandum Opinion.